## 65112. RODGERS v. GEORGIA TECH ATHLETIC ASSOCIATION.

POPE, Judge.

Franklin C. "Pepper" Rodgers brought this breach of contract action against the Georgia Tech Athletic Association to recover the value of certain perquisites which had been made available to him as the head coach of football at the Georgia Institute of Technology. Both parties moved for summary judgment, Rodgers' motion encompassing only the issue of liability under his contract of employment with the Association. The trial court granted the Association's motion and denied Rodgers' motion. The issue presented for resolution by this appeal is whether Rodgers is entitled to recover the value of certain perquisites or "fringe benefits" of his position as head coach of football under the terms of his contract of employment with the Association.

Rodgers was removed from his coaching position by vote of the Association's Board of Trustees on December 18, 1979, notwithstanding a written contract of employment through December 31, 1981. In addition to an annual salary, the contract provided that Rodgers, as an employee of the Association, would be entitled "to various insurance and pension benefits and perquisites" as he became eligible therefor. Rodgers makes no claim for base

salary, health insurance and pension plan benefits, all of which were provided voluntarily by the Association through December 31, 1981, the expiration date of the contract. Rather, his claim is solely for the value of the aforesaid "perquisites," to which he claims entitlement under this employment contract.

Rodgers lists some 29 separate items as such perquisites. In support of his motion for summary judgment, Rodgers categorized these items into two groups: A. Items provided directly to him by the Association but discontinued when Rodgers was relieved of his duties, and B. Items provided by sources other than the Association by virtue of his position as head coach of football. These items are listed in the Appendix to this opinion.

The subject contract was in the form of a letter from the Association dated April 20, 1977 offering Rodgers the position of head coach of football for three years at an annual salary plus certain benefits and perquisites. This contract provided that Rodgers could be terminated for illness or other incapacity continuing for three months, death, or "any conduct or activity involving moral turpitude or which in the opinion of [the Board of Trustees] would constitute an embarrassment to the school." Rodgers accepted this contract on April 25, 1977. This contract was extended until January 1, 1982 by a subsequent letter agreement between the parties. At its December 18, 1979 meeting, the Association's Board of Trustees determined that a change should be made in the position of head coach of football. The following statement was approved and released to the press: "The Board of Trustees of the Georgia Tech Athletic Association met at its regular December meeting this morning. After full discussion, the Board determined that in the best interest of Georgia Tech, with full respect for Coach Pepper Rodgers, a change should be made in the position of Head Coach of Football. The Board stated that it would, of course, honor the financial contractual obligation to Coach Rodgers and that Doug Weaver, the Athletic Director, had been directed to immediately pursue the obtaining of a new head coach."

1. Rodgers asserts essentially two theories of recovery: (a) breach of contract, and (b) appropriation of a "property right." As to the second theory, Rodgers contends that the Association appropriated, that is, took without permission, his position and title as head coach of football at Georgia Tech. In support of this contention he cites *Martin Luther King, Jr. Center &c., Inc. v. American Heritage Products,* 250 Ga. 135 (296 SE2d 697) (1982); *McQueen v. Wilson,* 117 Ga. App. 488 (3) (161 SE2d 63); revd. on other grounds, *Wilson v. McQueen,* 224 Ga. 420 (162 SE2d 313) (1968); *Cabaniss v. Hipsley,* 114 Ga. App. 367 (4) (151 SE2d 496) (1966). These cases stand for the proposition that the appropriation

of another's name and likeness without consent for the financial gain of the appropriator is a tort in Georgia. The case at bar is factually distinguishable from these cases in that the alleged appropriation here is of Rodgers' position and title of employment, not of his name and likeness. Further, Rodgers does not allege that the Association appropriated his position and title for financial gain. We have been cited to no authority, nor are we aware of any, which stands for the proposition that a person has a property right in the position and title of his employment. An employee may not generally obtain specific performance of his contract of employment (*Greer v. Pope,* 140 Ga. 743 (1, 2) (79 SE 846) (1913); see also Code Ann. § 55-107 (now OCGA § 9-5-7)), his only recourse for breach being damages (see *Grant-Jeter Co. v. American Real Estate Co.,* 159 Ga. 80 (3) (125 SE 73) (1924)). That is to say, generally an employer may, rightfully or wrongfully, remove an employee from his employment at any time. The employee's only recourse for wrongful removal is the recovery of damages; he has no right to recover the position and title of his employment. It follows that an employee has no property right in such position and title. Therefore, we will turn our attention to Rodgers' breach of contract theory.

2. Rodgers contends that he was terminated or fired from his employment by the Association. However, the evidence of record supports the Association's view that Rodgers was merely relieved of his duties as the head coach of football yet remained an employee of the Association, albeit without any function or duties, for the duration of his contract. In either event, this disassociation of Rodgers from his position and duties was not "for cause" pursuant to the terms of the contract. Therefore, the Association was obligated to pay Rodgers that part of the amount set forth in the contract "which he himself was entitled to receive as compensation for his services." *Southern Cotton Oil Co. v. Yarborough,* 26 Ga. App. 766, 770 (107 SE 366) (1921); see also *Dinnan v. Totis,* 159 Ga. App. 352 (1) (283 SE2d 321) (1981).

In addition to a salary, health insurance and pension benefits, the contract provided that Rodgers, as an employee of the Association, was entitled to "perquisites" as he became eligible therefor. The term "perquisites" is defined as "[e]moluments or incidental profits attaching to an office or official position, beyond the salary or regular fees." Black's Law Dictionary 1299 (4th ed. 1968). The term is also defined as "a privilege, gain, or profit incidental to an employment in addition to regular salary or wages; *esp:* one expected or promised [e.g.,] the [perquisites] of the college president include a home and car. . . ." Webster's Third New International Dictionary 1685 (1981). Thus, Rodgers was entitled to

the perquisites (or their value) for which he was eligible during the duration of his contract. The problem presented here for resolution is to determine whether any of the items listed in the Appendix were indeed perquisites to which Rodgers was entitled pursuant to his contract.

First, we must determine the intention of the parties as to the scope of the perquisites to which Rodgers was entitled under the contract. See Code Ann. § 20-702 (now OCGA § 13-2-3). The pertinent language of the contract provides: "You, as Head Coach of Football, will devote your time, attention, skill, and efforts to the performance of your duties as Head Coach under the policies established by the Athletic Board and the Athletic Director, and you will receive compensation at [an] annual rate of $35,175.00 payable in equal monthly installments. In addition, as an employee of the Association, you will be entitled to various . . . perquisites as you become eligible therefor." The Association contends that the language "as an employee of the Association" limited Rodgers' eligibility for perquisites to those items common to all Association employees. Rodgers argues that he was not only entitled to those perquisites common to all Association employees, but that he was also entitled to additional perquisites for which he became eligible as the head coach of football. Since the contract is susceptible to either construction, it is ambiguous. This ambiguity may be resolved by applying the appropriate rules of construction.

"If a contract is so framed as to be susceptible of two constructions, that interpretation which is least favorable to the author . . . should generally be accepted. [Cits.] 'When it is possible to do so without contravening any rule of law, the courts will construe a contract as binding on both the parties, where, from the language of the contract, the conduct of the parties, and all the attendant circumstances, it appears that the intention of the parties was that both should be bound [thereby], and substantial justice requires that the contract be given effect. [Cits.]' " *Bridges v. Home Guano Co.,* 33 Ga. App. 305, 309 (125 SE 872) (1924); see *Clear-Vu Cable v. Town of Trion,* 244 Ga. 790 (1) (262 SE2d 73) (1979); see also *Asa G. Candler, Inc. v. Ga. Theatre Co.,* 148 Ga. 188 (5) (96 SE 226) (1918). The subject contract was drafted by the Association. Moreover, the record discloses that Rodgers, during his tenure as head coach of football, did receive perquisites in addition to those received by other Association employees. Accordingly, we conclude that the parties intended that Rodgers would receive perquisites, as he became eligible therefor, based upon his position as head coach of football and not merely as an employee of the Association.

We must next determine the nature of the items for which

Rodgers seeks damages, i.e., whether the items listed in the Appendix are perquisites vel non. We will first address ourselves to those items listed in Section A of the Appendix and address separately those items listed in Section B.

(a) The Association asserts that Rodgers was not entitled to any of the items listed in Section A because they were expense account items — "tools" to enable him to more effectively execute his duties as head coach of football. Rodgers counters that those items were an integral part of the total compensation package that he received as head coach of football and constituted consideration for his contract of employment. We certainly agree with the Association that Rodgers would be entitled to recover only "compensatory damages that he suffered by reason of the breach of his contract; in other words, that the proper measure of damages arising from the breach of the contract of employment was actual loss sustained by the breach, and not the gross amount of [his] wages and expenses [under the contract]." *Southern Cotton Oil Co. v. Yarborough,* supra, at 770; Crabtree v. Elizabeth Arden Sales Corp., 105 NYS2d 40 (13) (1951); see also *Roberts v. Ridgen,* 81 Ga. 440, 443 (7 SE 742) (1888); *Chappell v. Western R. of Ala.,* 8 Ga. App. 787 (1) (70 SE 208) (1911). However, the evidence offered as to the nature of the items in Section A was in considerable dispute. The fact that these items were not reported as taxable income by Rodgers is not conclusive as to their nature (see *Mullinax v. Mullinax,* 234 Ga. 553, 555 (216 SE2d 802) (1975)), nor is the fact that Rodgers reimbursed the Association for occasional "personal" expenses which it had paid. Thus, with three exceptions, we cannot say as a matter of law either that Rodgers was entitled to the items listed in Section A as perquisites of his employment, or that he was not.

The three exceptions to this finding are the services of a secretary, the services of an administrative assistant, and the cost of trips to football conventions, clinics, etc. The undisputed purpose of the services of the secretary and administrative assistant was to assist Rodgers in fulfilling his duties under the contract. Since Rodgers had been relieved of his duties as head coach of football, and, thus, had no responsibilities under the contract, he had no need for these support services. This is true even though the secretary and administrative assistant may have occasionally provided personal services to Rodgers beyond their duties to him as head coach of football since, as Rodgers admits, their primary functions were to provide services to the head coach of football. Also, since Rodgers had been relieved of his coaching duties, the Association was not obligated to pay his expenses for trips to various football-related activities, these costs clearly being business-related and not in the nature of compensation.

Cf. *Southern Cotton Oil Co. v. Yarborough,* supra.

(b) We turn our attention finally to those items in Section B of the Appendix — items which Rodgers asserts were perquisites he received from sources other than the Association by virtue of his position as head coach of football at Georgia Tech. The Association argues that Rodgers' claim for recovery of these items was in the nature of a tort claim for humiliation and injury to feelings. Rodgers counters that these items were perquisites within the contemplation of the parties which constituted part of the consideration for the contract even though they were provided by sources other than the Association.

We do not construe Rodgers' claim for recovery of the items in Section B to be in the nature of a personal injury tort. "All pleadings shall be so construed as to do substantial justice." Code Ann. § 81A-108(f) (now OCGA § 9-11-8(f)). Also, pleadings will be construed to serve the best interests of the pleader. *Riviera Equip. v. Omega Equip. Corp.,* 147 Ga. App. 412, 416 (249 SE2d 133) (1978). The several and ancient cases from other jurisdictions cited by the Association in support of its contention all involve situations wherein the party wrongfully removed from his employment by his employer's breach of the employment contract brought suit to recover damages for personal injury such as loss of reputation, humiliation, etc. In the case at bar Rodgers claims that the items in Section B were part of the consideration of his contract. No claim for personal injury appears. Furthermore, the State Court of Fulton County, where this case was brought, has no jurisdiction over personal injury claims. Construing Rodgers' complaint to serve his best interests, we hold that the Association's argument here is without merit. Nevertheless, we must now determine whether Rodgers may recover the items in Section B under his breach of contract theory.

"[T]he consideration of a contract need not flow directly from the promis[or] [here, the Association], but may be the promise or undertaking of one or more third persons." *Bing v. Bank of Kingston,* 5 Ga. App. 578, 580 (63 SE 652) (1908). "Damages growing out of a breach of contract, in order to form the basis of a recovery, must be such as can be traced solely to the breach, must be capable of exact computation, must have arisen naturally and according to the usual course of things from such breach, and must be such as the parties contemplated as a probable result of the breach." *Sanford-Brown Co. v. Patent Scaffolding Co.,* 199 Ga. 41 (33 SE2d 422) (1945). "As a general rule, a party is entitled to recover profits that would have resulted from a breach of a contract into which he has entered, where the breach is the result of the other party's fault. And while a breach

of the original contract will not ordinarily entitle a plaintiff to recover as damages the profits of collateral enterprises or subcontracts, yet where the knowledge of the subcontract [or collateral enterprise] is within the contemplation of the parties when the original contract is made, and is known to have been made with reference thereto, anticipated profits shown to be certain, fixed in amount, and the direct fruit of the contract, are recoverable. Profits are excluded only when there are no criteria, definite and certain, upon which an adjudication can be based. They then become speculative and imaginary." *Carolina Portland Cement Co. v. Columbia Improvement Co.,* 3 Ga. App. 483 (2) (60 SE 279) (1908).

We will apply the foregoing legal principles to the facts of record. Can Rodgers' loss of the items in Section B be traced solely to the Association's breach of the contract? Rodgers testified that he received these perquisites as a result of his being head coach of football at Georgia Tech. The record discloses, however, that the items relating to housing and the cost of premiums on a life insurance policy were discontinued several years prior to the Association's breach of contract and were, in fact, not related to the breach. Thus, these items were properly excluded by the trial court. The remaining items were discontinued as the direct result of Rodgers being relieved of his duties as head coach of football.

Are the remaining items in Section B capable of exact computation? A "gift" is defined as "[a] voluntary transfer of personal property without consideration." Black's Law Dictionary 817 (4th ed. 1968). A gift, then, being a *voluntary* transaction and *without consideration,* can not form an enforceable part of the consideration of a contract. Although Rodgers may have received gifts of money and personalty during his tenure as head coach of football, such voluntary contributions to his financial well-being are totally incapable of exact computation, for a gift made in one year is no assurance of a similar gift in the next. In fact, Rodgers concedes that he did not receive these gifts each year. Thus, the item which listed various financial gifts was properly excluded from recovery. The items now remaining are sufficiently capable of computation. See generally *Hoffman v. Louis L. Battey Post &c. Am. Legion,* 74 Ga. App. 403, 410-1 (39 SE2d 889) (1946).

Did these remaining items arise naturally and according to the usual course of things, and were they such as the parties contemplated as a probable result of a breach? There is no evidence of record showing that the Association had any knowledge of Rodgers' free lodging at certain Holiday Inns or of his membership in Terminus International Tennis Club. Thus, the loss of these items could not be such as was contemplated as a probable result of a breach

of the contract. The evidence was in dispute as to the remaining items — profits from his television and radio shows and from his summer football camp plus the loss of use of a new automobile and tickets to professional sporting events — i.e., whether such items were contemplated by the parties at the time the contract was executed as perquisites or fringe benefits to which Rodgers would be entitled as the result of his position as head coach of football at Georgia Tech. These items are of the type commonly provided to head coaches at major colleges and universities. There was some evidence that the Association knew that Rodgers would receive (and, in fact, did receive) these benefits as the result of his head coaching position and that his removal from that position would result in the loss of these benefits. In fact, some members of the Association assisted Rodgers in obtaining many of these items. Also, there was at least some evidence by which the amount of these items could be fixed. Therefore, summary judgment in favor of the Association as to these items was inappropriate. See *Glennville Hatchery, Inc. v. Thompson,* 164 Ga. App. 819 (3) (298 SE2d 512) (1982). For these same reasons, summary judgment in favor of Rodgers was properly denied.

In summary, a question of fact remains as to whether Rodgers is entitled to recover those items listed in Section A of the Appendix not excluded in this opinion and also those items in Section B not heretofore excluded, any recovery being subject to proof of the amount of his damages as set forth in this opinion. All items which have been excluded are denoted by asterisks in the Appendix.

*Judgment affirmed in part; reversed in part. Deen, P. J., and Sognier, J., concur.*

DECIDED MARCH 16, 1983 —
REHEARING DENIED APRIL 1, 1983 —

*John K. Dunlap,* for appellant.
*Judson Graves, Arthur Howell, Earle B. May, Jr.,* for appellee.

APPENDIX.

A. Benefits and Perquisites Received by Rodgers Directly from the Georgia Tech Athletic Association.

(1) gas, oil, maintenance, repairs, other automobile expenses;

(2) automobile liability and collision insurance;

(3) general expense money;

(4) meals available at the Georgia Tech training table;

(5) eight season tickets to Georgia Tech home football games during fall of 1980 and 1981;

(6) two reserved booths, consisting of approximately 40 seats at

Georgia Tech home football games during fall of 1980 and 1981;

(7) six season tickets to Georgia Tech home basketball games for 1980 and 1981;

(8) four season tickets to Atlanta Falcon home football games for 1980 and 1981;

(9) four game tickets to each out-of-town Georgia Tech football game during fall of 1980 and 1981;

(10) pocket money at each home football game during fall of 1980 and 1981;

(11) pocket money at each out-of-town Georgia Tech football game during fall of 1980 and 1981;

(12) parking privileges at all Georgia Tech home sporting events;

* (13) the services of a secretary;

* (14) the services of an administrative assistant;

(15) the cost of admission to Georgia Tech home baseball games during spring of 1980 and 1981;

* (16) the cost of trips to football coaches' conventions, clinics, and meetings and to observe football practice sessions of professional and college football teams;

(17) initiation fee, dues, monthly bills, and cost of membership at the Capital City Club;

(18) initiation fee, dues, monthly bills, and cost of membership at the Cherokee Country Club;

(19) initiation fee and dues at the East Lake Country Club.

B. Benefits and Perquisites Received by Rodgers from Sources Other Than the Georgia Tech Athletic Association by Virtue of Being Head Coach of Football.

(1) profits from Rodgers' television football show, "The Pepper Rodgers Show," on Station WSB-TV in Atlanta for the fall of 1980 and 1981;

(2) profits from Rodgers' radio football show on Station WGST in Atlanta for the fall of 1980 and 1981;

(3) use of a new Cadillac automobile during 1980 and 1981;

(4) profits from Rodgers' summer football camp, known as the "Pepper Rodgers Football School," for June 1980 and June 1981;

* (5) financial gifts from alumni and supporters of Georgia Tech for 1980 and 1981;

* (6) lodging at any of the Holiday Inns owned by Topeka Inn Management, Inc. of Topeka, Kansas, for the time period from December 18, 1979 through December 31, 1981.

* (7) the cost of membership in Terminus International Tennis Club in Atlanta for 1980 and 1981;

(8) individual game tickets to Hawks basketball and Braves

baseball games during 1980 and 1981 seasons;

* (9) housing for Rodgers and his family in Atlanta for the period from December 18, 1979 through December 31, 1981;

* (10) the cost of premiums of a $400,000.00 policy on the life of Rodgers for the time period from December 18, 1979 through December 31, 1981.