## A90A1487. GREEN et al. v. SUN TRUST BANKS, INC. et al.

(399 SE2d 712)

BEASLEY, Judge.

Green and six other former employees of Trust Company Bank and its affiliated companies, Trust Company of Georgia and Sun Trust Banks, appeal from the grant of summary judgment to the banks and four supervisors on claims arising from termination of their employment.

Suit was filed in superior court, removed to federal court due to federal race and sex discrimination claims, and remanded to superior court after plaintiffs stipulated that they would not assert the federal claims there. Aside from those claims, the complaint alleged: defamation in that "defendants stated orally and in writing that plaintiffs were terminated for extortion by waiving late payments and interest charges on installment loans owed by some plaintiffs and some customers," and invasion of privacy by way of said defamation; intentional infliction of emotional distress; wilful and wanton conduct giving rise to punitive damages; wrongful termination based on race, a ground assertedly impermissible as a matter of public policy; attorney fees.

Defendant Cline was a senior vice president who directly oversaw defendant Quidley, a group vice president, and defendant Chaney, an assistant vice president. Quidley oversaw defendant Scott, a vice president in charge of auto leasing, which was supervised by Gallaspy (not a party) and employed plaintiffs Hudson and Jennings, both black females. Scott also directly supervised the dealer section of leasing, in which plaintiff Miles, a white male, worked. Chaney was in charge of installment loan operations where plaintiffs Brandenburg, Sneeze, and Wilder worked, and in which plaintiff Green was the supervisor. Sneeze and Wilder are black females; Green and Brandenburg white females. Summarizing, in addition to the defendant corporations, the parties were Hudson, Jennings, Sneeze, Wilder (black females), Green, Brandenburg (white females), and Miles (white male) as plaintiffs, and Cline, Quidley, Scott and Chaney as defendants.

1. Plaintiff-appellants' briefs contain numerous quotations from the depositions of defendants Chaney, Quidley and Cline. The banks have filed a motion to strike these portions of the briefs on the ground none of these was filed in the court below and are therefore not part of the record on appeal.

Neither the Appellate Practice Act nor the Rules of this court provide for formal striking of references from briefs, but this court may only consider matters of record in the court below. Assertions of fact made in briefs not supported by the record are not considered. *Blue v. R. L. Glosson Contracting,* 173 Ga. App. 622, 623 (1) (327 SE2d 582) (1985). References to the Quidley and Chaney depositions,

which were not filed below nor considered by the court, will not be considered. Cline's deposition, although not originally filed below, was considered by the court in its ruling and was made part of the record pursuant to OCGA § 5-6-41 (f). It will be considered.

2. Viewed with all inferences and reasonable doubts in favor of plaintiffs, opponents of summary judgment, *Eiberger v. West*, 247 Ga. 767, 769 (1) (281 SE2d 148) (1981), the facts presented for summary judgment were as follows.

In the fall of 1986, one of the bank collectors was reviewing accounts with a lot of collection activity and noticed that, although Hudson had a significant amount of collection activity, none of her payments showed on the bank records as past due.

The installment loan operations division was responsible for processing incoming payments on installment loans and crediting them to the customer's account. A payment received after the due date was considered late. If payment was not made within 10 days of the due date, a late fee, usually 5-10 percent of the payment, was assessed. Employees in that division were trained in filling out transaction slips by which, using an appropriate code, an employee could cause a payment to show as timely when it was not or could waive the late fee without altering the receipt date.

Pursuant to federal and state banking laws, the banks carried a fidelity bond on all employees. The bond required that all employees be bondable, and that determination was to be made by the personnel department of the banks. The bond by its language terminated as to any employee committing a "dishonest or fraudulent" act.

When employees were hired, they were given an employee benefits handbook which stated: "The nature of the Company's business imposes special obligations on all employees to safeguard its integrity. Employees are expressly forbidden to use their association with the Company for personal gain beyond authorized compensation and benefits. If there is any question that an activity might violate or appear to violate this principle, the employee must seek guidance from appropriate management authority."

Hudson, who had worked in installment operations previously, was familiar with procedures there. She asked Sneeze to backdate one of her own personal payments on an installment loan so as to avoid a late fee. She believed that Sneeze also backdated two other payments of hers.

Sneeze acknowledged backdating Hudson's payments as well as those of Jennings. Sneeze also acknowledged the bank policy that customers who asked that late fees be waived or that their payments be accepted as timely due to bank error had to have a valid reason before the employee was authorized to do that. No reason was given by or requested from Jennings and Hudson.

Jennings initially denied ever having her payments backdated but eventually acknowledged that she asked for waiver of late fees. No reason was given as to why she met the waiver criteria.

Wilder admitted backdating her own payment without approval from a superior and that of another employee, without a reason. She did not know it was wrong.

Brandenburg backdated her own payment which was 30 days late. Had she not done so, her loan status would have been negatively reported to the credit bureau. The only times she backdated payments for regular bank customers were on instructions from a bank officer or customer representative. She was aware that she could have avoided a late fee without backdating her payment.

The day after Hudson was terminated, Green went to her supervisor Chaney and told her she had also backdated some of her own payments, but was unaware it was wrong. She had backdated five to ten of her payments so they would appear timely.

Plaintiffs were dismissed in December 1986. Miles was a bank officer who was not terminated until March of 1987. He and Holliday, another bank employee, had an installment loan for a house trailer. He knew that an employee was not to backdate his personal loan. The employee who backdated the payment at Miles' direction did so because he was an officer of the bank who could authorize it. She was not dismissed.

3. Enumerations 4 and 5, concerning the claim for discharge in violation of public policy plus a discovery dispute unresolved at the time of summary judgment, will be addressed together.

(a) Plaintiffs urge that *A. L. Williams & Assoc. v. Faircloth*, 259 Ga. 767 (386 SE2d 151) (1989), created in footnote 4 of Division 3 a cause of action for wrongful termination in an employment at will situation when race-motivated in violation of public policy. We do not read the suggestion as having changed the law in Georgia. See *Borden v. Johnson*, 196 Ga. App. 288, 289 (1) (395 SE2d 628) (1990), cert. denied, 196 Ga. App. ___. Cf. OCGA § 45-19-20 et seq., the Fair Employment Practices Act of 1978.

(b) Plaintiffs filed two motions to compel discovery. The first was to compel response to 11 interrogatories which were objected to by defendants as irrelevant, immaterial, overbroad, burdensome and intended to harass the banks. The interrogatories dealt with other incidents of backdating by other employees of the bank, including all backdating for customers who were not employees, and with the extent of the investigation conducted by the banks of the plaintiffs' backdating.

The second motion dealt with the banks' refusal to answer two interrogatories seeking names of persons on two lists "described by Terry Chaney and Jim Scott in their respective depositions." These

depositions were not part of the record below and the motion thus presented nothing for either that court or this one to rule upon. The motion also sought to compel production of documents. Requests 1—4 and 15 are not reviewable because they refer to the Chaney and Scott depositions.

Requests 10 and 11 sought the loan history of a customer who was not involved in the dismissal of plaintiffs and Requests 14 and 16 sought all records dealing with the security investigation of plaintiffs.

No express order was entered by the court on these discovery matters; summary judgment was entered instead. "The trial judge is presumed to know the law [*Dixon v. Dixon*, 211 Ga. 557, 563 (87 SE2d 369)] and presumed to 'faithfully and lawfully (perform) the duties devolving upon it by law.' *Sullivan v. Brownlee*, 174 Ga. App. 813 (1) (331 SE2d 622)." *Windom v. State*, 187 Ga. App. 18, 19 (2) (369 SE2d 311) (1988); *In re R. L. Y*, 181 Ga. App. 14, 16 (351 SE2d 243) (1986). It is presumed that the court implicitly denied the motions to compel upon entering summary judgment. *Windom*, supra. "[T]his court will not presume the trial court committed error where that fact does not affirmatively appear." *Whiteley v. State*, 188 Ga. App. 129, 130 (1) (372 SE2d 296) (1988); *Fortson v. Fortson*, 195 Ga. 750, 758 (3) (25 SE2d 518) (1943).

The discovery requests were filed in district court when the complaint contained federal claims for race and sex discrimination.[1] The first motion to compel was filed in district court, along with a request for extension of discovery time, after the time for discovery had expired. The second was filed after the discovery had been refiled in superior court. They contend that information of others engaged in similar conduct based upon customary practice at the bank and not fired, would be relevant to the defamation claim.

This issue need not be resolved because, as we conclude, infra, there was no publication of the statements.

4. The motion is governed by the following principles in addition to those already stated. "In order '(t)o prevail on [such] a motion . . . (OCGA § 9-11-56), a defendant-movant is required to pierce the allegations of the complaint and to establish as a matter of law that the plaintiff could not recover under any theory fairly drawn from the pleadings and the evidence. (Cits.)' *Holiday Inns v. Newton*, 157 Ga. App. 436 (278 SE2d 85) (1981); [Cits.]" *Willis v. Allen*, 188 Ga. App. 390, 391 (373 SE2d 79) (1988). The pleadings are construed in favor of the pleader. OCGA § 9-11-8 (f); *Rodgers v. Ga. Tech Athletic Assn.*, 166 Ga. App. 156, 161 (2b) (303 SE2d 467) (1983).

---

[1] The contention was that the bank fired the four black females because of their race and/or sex and then fired the two white females and one white male to cover this up.

"Once the moving party for summary judgment has carried its burden of making out a prima facie case, the burden shifts and the opposite party must come forward with rebuttal evidence or suffer judgment against him. *Meade v. Heimanson*, 239 Ga. 177, 180 (236 SE2d 357) (1977); [Cit.]" *Bright v. Knecht*, 182 Ga. App. 820, 821 (357 SE2d 159) (1987).

"[A] party resisting summary judgment, in addition to coming forward with evidence which is sufficient to create a genuine issue of material fact, must present some credible warrant for its admissibility." *Wilson v. Nichols*, 253 Ga. 84, 86 (3) (316 SE2d 752) (1984).

The complaint's allegation of defamation was that "[d]efendants stated orally and in writing that Plaintiffs were terminated for extortion by waiving late payments and interest charges on installment loans owed by some Plaintiffs, and some customers to the bank." Although it was also alleged that this information was provided to the bonding company, there is no evidence that any such contact was ever made. Nor is there any evidence that such statement ever appeared in writing. Therefore only slander is involved.

" 'Slander or oral defamation consists in: (1) Imputing to another a crime punishable by law . . . [and making charges against another in reference to his trade, office, or profession, calculated to injure him therein]' OCGA § 51-5-4 (a) (1). 'Publication is indispensable to recover for slander. (Cit.)' *Walter v. Davidson*, 214 Ga. 187, 190 (104 SE2d 113) (1958). Generally, publication is accomplished by communication to anyone other than the person slandered. *Pavlovski v. Thornton*, 89 Ga. 829 (2) (15 SE 822) (1891)." *Kurtz v. Williams*, 188 Ga. App. 14, 15 (3) (371 SE2d 878) (1988).

The only evidence of the word "extortion" was Brandenburg's statement that "one of the defendants" had used that word. She could not specify which defendant and acknowledged that only she and the speaker were present. Thus, even if admissible, the statement was never published. *Pavlovski*, supra.

Next we consider the words "embezzlement" and "stealing."

Miles had no evidence of any such words even being used regarding him and stated that his only claim was that the banks had invaded his privacy.

Marie Green deposed that Chaney, in a meeting with her and Sneeze, told them that Hudson had been fired for backdating and that was the same as stealing from the bank. Green was Sneeze's immediate supervisor. During a meeting with employees of the installment loan center, Chaney likened backdating to taking money from a teller's drawer and to stealing.

Hudson deposed that she was called to a meeting with Gallaspy, her immediate supervisor, and Scott, Gallaspy's supervisor, during which Scott said what Hudson had done was embezzlement or steal-

ing. Cline told Hudson during a phone call with her that she had embezzled and stolen.

Jennings had a conversation with Scott during which he told her she was being fired for backdating payments.

Sneeze was told by Chaney that what she had done was the same as embezzlement.

Wilder had no knowledge of any such statements.

The only other evidence on this point was that there was gossip throughout the bank that plaintiffs had stolen and embezzled and were going to be prosecuted. There are numerous statements that one person told one plaintiff that some other person, frequently unidentified, had told him or her that they had heard similar statements. "[A]n allegation: that A said that B said . . . is an allegation of what A said but it is not an allegation of what B said." *McKown v. Great A & P Tea Co.*, 99 Ga. App. 120, 123 (2) (107 SE2d 883) (1959). " 'Ordinarily hearsay testimony is not only inadmissible but wholly without probative value, and its introduction without objection does not give it any weight or force whatever in establishing a fact.' [Cit.]" *Quinones v. Maier & Berkele*, 192 Ga. App. 585, 588 (1c) (385 SE2d 719) (1989). Thus, this evidence is without value.

In opposing the summary judgment, plaintiffs argue that *Kurtz*, supra, was not applicable because: (a) there was no bona fide reason for the communication in that Cline had ulterior motives and that backdating, the ostensible reason for firing, was not bona fide; (b) the communication went beyond the group which needed to know; and (c) the compelled self-publication rule of *Colonial Stores v. Barrett*, 73 Ga. App. 839 (38 SE2d 306) (1946) applies.

(a) Although plaintiffs argue that *Kurtz* should be reconsidered and overruled, we are not persuaded to agree.

"Over the years . . . , an exception to the broad definition of publication has evolved: when the communication is intra-corporate, . . . , and is heard by one who, because of his/her duty or authority has reason to receive the information, there is no publication of the allegedly slanderous material, and without publication, there is no cause of action for slander." *Kurtz*, supra at 15; e.g., *Walter v. Davidson*, 214 Ga. 187, 191 (2) (104 SE2d 113) (1958); *Williams v. Cook*, 192 Ga. App. 811 (1) (386 SE2d 665) (1989); *Carter v. Willowrun Condominium Assoc.*, 179 Ga. App. 257, 258 (1) (345 SE2d 924) (1986). Of the statements proven by admissible evidence, most were either made directly to one of the plaintiffs in one-on-one conversations, and therefore not published, or made in meetings with the involved plaintiff and immediate supervisory personnel and a personnel department representative. These were all intra-corporate communications under *Kurtz*.

(b) There was evidence of two group meetings. Green testified

that Chaney held a meeting in the installment loan center with the employees of that section. Green deposed that "[t]he only thing I can recall is that [Chaney] did tell us then that it was wrong for us to be doing that [backdating own loans] and that it was more or less stealing from the bank." The meeting occurred before Green's dismissal, thus during the investigation of the backdating. The second was held by Cline, again with only installment loan operations department employees present. It occurred in February 1987. He told them he wanted to give them the specifics of the firings, that the employees had backdated their own and friends' loan payments and that "[t]hey cannot be bonded. We had no choice."

Pretermitting the question of whether these meetings come under the *Kurtz* rationale, they do come within OCGA § 51-5-7 as statements made "in good faith in the performance of a public duty," or a "legal or moral private duty." Accepting plaintiffs' statements that they were unaware that such a practice was against bank policy and wrong, Chaney and Cline had a duty as supervisors to advise the employees of the section involved in processing loans that it was improper. Also, addressing a group including new employees who replaced plaintiffs, Cline advised them of the backdating by plaintiffs and that they were therefore unbondable. He had been advised of the bond problem by the head auditor and personnel manager of the bank, who were directly responsible for making that decision. The statements were privileged. *Williams*, supra at 812 (2); *Land v. Delta Airlines*, 147 Ga. App. 738 (5) (250 SE2d 188) (1978).

Plaintiffs correctly point out that malice in making such statements will defeat the privilege. *Cohen v. Hartlage*, 179 Ga. App. 847, 849 (348 SE2d 331) (1986). There is a total lack of evidence of any such malice. *Williams*, supra at 812 (3); *Rucker v. Gandy*, 158 Ga. App. 104, 106 (1) (279 SE2d 259) (1981).

(c) Plaintiffs also contend that trial should have been allowed due to compelled self-publication to potential employers while applying.

*Colonial Stores v. Barrett*, supra, involved compelled, not voluntary publication by the employee. This was explained in *Sigmon v. Womack*, 158 Ga. App. 47, 49 (1) (279 SE2d 254) (1981) and *Brantley v. Heller*, 101 Ga. App. 16, 20 (2) (112 SE2d 685) (1960). All plaintiffs have shown is purely voluntary self-publication, and *Colonial Stores* is of no assistance to them. The conclusion must be that there was no error in granting summary judgment on these defamation claims.

5. Was summary judgment warranted on the claim for intentional infliction of emotional distress?

In order to sustain such a claim, plaintiffs were required to put forth evidence that defendants' behavior was wilful and wanton or intentionally directed to harm plaintiffs; that these actions were such

as would naturally humiliate, embarrass, frighten, or outrage plaintiffs; and that the conduct caused mental suffering or wounded feelings or emotional upset or distress. *Coleman v. Housing Auth. &c.*, 191 Ga. App. 166, 170 (1) (381 SE2d 303) (1989).

The absence of any evidence that the conduct of defendants rose to the requisite level of outrageousness, *Quinones*, supra at 587 (1a), warranted summary judgment.

6. Finally, plaintiffs contend summary judgment on their invasion of privacy claim should have survived. In their First Amended Complaint, plaintiffs alleged that the statements were defamatory as a matter of law and "constituted an invasion of each Plaintiffs' common law right to privacy."

Assuming this was sufficient to raise a claim, the argument that plaintiffs were placed in a false light before the entire bank population, thereby invading their privacy, is not reflected in the record and therefore presents nothing for our review. Even on its merits, the argument fails. As discussed above, there is no admissible evidence that the entire bank population was advised of the situation by the defendants. The two group meetings were subject to a privilege, assuming the statements were disseminated beyond the necessary intra-corporate group, and provide no basis for the claim.

*Judgment affirmed. Deen, P. J., and Pope, J., concur.*

DECIDED NOVEMBER 16, 1990 —
REHEARING DENIED NOVEMBER 30, 1990 — 

*Henning, Aitkens, Snellings & Kearns, Stanley T. Snellings, Ford & Haley, James L. Ford*, for appellants.

*Constangy, Brooks & Smith, Edward Katze, Rosemary P. Lumpkins, Donald W. Benson, Neely & Player, John W. Winborne III*, for appellees.