A98A1534, A98A1535. DISCOVERY POINT FRANCHISING, INC. et al. v. MILLER et al.; and vice versa.
(505 SE2d 822)

Judge Harold R. Banke.

The underlying litigation arose from disputes involving Discovery Point Franchising, Inc. ("DPFI"), a corporate franchisor of child

care centers, and a DPFI franchise owned by Douglas and Sharon Miller. Ultimately, the litigation encompassed Clifford Clark and Diane Alexander, the owners of DPFI, as well as the Millers individually. A divided jury verdict resulted in the instant appeal and cross-appeal.

The record showed the following. While residing in Florida, Douglas Miller received a letter dated June 4, 1993, faxed from Clifford Clark. This document states in pertinent part: "[w]e have proposed the following: 1. We will assist you in the purchase and opening of a Discovery Point Center with your investment of a minimum of $50,000 in the project. $25,000 would be for the Franchise Fee and the other $25,000 would purchase equipment. This means that we are prepared to loan you and Sharon personally up to $150,000, dependent upon the actual cost of the project. I emphasize actual cost of the project, as there is ample opportunity for the developer to add profit to the project. You would own the real estate, equipment, etc. and would be the very first DP franchisee to do so." The Millers sought to enforce this facsimile as a binding "actual cost" contract.

In September 1993, Douglas Miller, who had relocated to Atlanta and become a DPFI franchise salesman, and his wife entered into a franchise purchase agreement with DPFI. The Millers also sought to buy the land on which their new facility was to be located, the building, and certain equipment and supplies ("franchise property"). In early October 1993, the Millers executed a real estate sales contract with Clark and Alexander for the purchase of the franchise property for $1.2 million. To obtain most of the financing, the Millers applied for a $950,000 SBA loan from the Commercial Bank of Georgia. Notwithstanding DPFI's termination of Douglas Miller's employment in December, the Millers proceeded with the closing on January 27, 1994. Among other documents, the Millers executed a $230,000 promissory note to Clark and Alexander secured by a deed.

Shortly after the Millers began operating their new franchise, problems between them and DPFI surfaced. When DPFI sued Douglas Miller for repayment of a $3,500 commission, the Millers counterclaimed for breach of Miller's employment contract, fraud in connection with the employment contract, intentional infliction of emotional distress, and rescission of the franchise agreement. After the Millers refused to repay the $230,000 note, Clark and Alexander filed a separate collection action to which the Millers counterclaimed for intentional infliction of emotional distress. While DPFI's action was pending, the Millers notified DPFI on March 1, 1996, that they were terminating the franchise agreement. DPFI then amended its suit to assert claims for breach of the franchise agreement, franchise fees, and attorney fees.

Clark testified that several months before the closing the parties

agreed to a $1.2 million purchase price with him and Alexander providing part of the financing as a second mortgage. Both Clark and Alexander testified that they never agreed to accept anything less from the Millers than the full amount of the $230,000 note and never agreed to sell the franchise property at cost. The SBA loan documents repeatedly reflect a second mortgage of $230,000 to the sellers and a $1.2 million purchase price.[1] David Boehmig, Commercial Bank's vice president in charge of SBA lending, oversaw the Millers' loan application. From early on, it was Boehmig's understanding that there would be "seller subordinated financing" by Clark and Alexander, the realty owners. The SBA "Funds Provided Statement," which the Millers signed and dated October 29, 1993, lists a $1.2 million purchase price and a $230,000 second mortgage. In an equity affidavit provided to Commercial Bank, the Millers attested that they owed a $230,000 note to Alexander and Clark. Boehmig recalled discussing the second mortgage note of $230,000 with the Millers. According to Boehmig, the bank would not have loaned the $950,000 to the Millers if the Millers did not have to repay the $230,000 note. Several months later, when Douglas Miller listed the business for sale with a commercial real estate broker, Miller informed the broker that the property was encumbered by an SBA loan for $950,000 and an assumable second mortgage for $230,000. Miller told the broker that the appraised value was $1.3 million and his asking price was $1.5 million.

The gist of the Millers' testimony was that they were fraudulently induced to purchase the franchise property and fraudulently induced to sign the note. The Millers claimed that relying on the June 1993 fax and statements by Clark and Alexander, they understood that they were to purchase the franchise property at "actual cost" a figure less than the $1.2 million purchase price. They testified that notwithstanding all the closing documents, the parties had a side agreement for repayment of less than the $230,000 note and less than the $1.2 million purchase price. According to the Millers, the promissory note would be enforced only to the extent that the actual cost of the project exceeded $950,000, the amount of the SBA loan. On cross-examination, Douglas Miller claimed that the $230,000 note was a sham transaction trumped up to deceive the bank and the SBA into believing there had been an equity infusion into the property. The Millers asserted that DPFI harassed them by threatening to accelerate the note and by instituting excessive inspections of their facility because DPFI wanted to wrest the franchise away and drive

---

[1] An independent appraisal conducted for the lender valued the property at $1.2 million.

them out of business.[2]

The six-page verdict form was complicated and consisted of nineteen questions. Initially, on question one, the jury determined that Clark and Alexander could enforce the $230,000 note and awarded $107,752.63 in damages to them on that claim. But the trial court rejected this verdict as inconsistent since it awarded less than the full amount of the note. The court then instructed the jury to consider question one as "an all or nothing proposition." The jury then apparently repositioned the $107,752.63 amount to the section for damages under the "actual cost" contract. The jury also awarded $120,403.50 to DPFI for the Millers' wrongful termination of the franchise agreement. Although the jury also found that DPFI breached the franchise agreement, it awarded no damages to the Millers. Similarly, the jury found for the Millers on their claim for fraud in the procurement of the note, but awarded no damages. The jury valued the Millers' claim for intentional infliction of emotional distress at $50,000. DPFI, Clark, and Alexander appeal, and the Millers cross-appeal. *Held*:

### Case No. A98A1534

1. The trial court erred by denying the motion for j.n.o.v. on the jury's finding that an "actual cost" contract governed the parties' relationship rather than the written real estate sales contract. The purported agreement that Clark and Alexander would sell the franchise property to the Millers at an "actual cost" to be determined later is simply too vague to be enforced. *Lemming v. Morgan*, 228 Ga. App. 763, 764 (1) (492 SE2d 742) (1997). Further, the written document, the fax of June 4, 1993, is legally insufficient because it lacks all essential terms including a legal description of the land, a sales price, and the specifics of payment. *Smith v. Wilkinson*, 208 Ga. 489, 493 (2) (67 SE2d 698) (1951). See *Smith v. Cox*, 247 Ga. 563 (277 SE2d 512) (1981) (contract for the sale of land which is partly written and partly oral is not enforceable). Moreover, this purported "actual cost contract" which included the sale of realty fails as a matter of law because it does not identify that realty.[3] *Smith*, 208 Ga. at 493 (2); *East Piedmont 120 Assoc. v. Sheppard*, 209 Ga. App. 664, 665 (434 SE2d 101) (1993); OCGA § 13-5-30 (4).

2. Clark and Alexander contend that the trial court erred in denying their motion for j.n.o.v. on the issue that the $230,000 note was procured by fraud and unenforceable. We agree. " 'Evidence that

---

[2] The note permitted acceleration in the event of a breach of the franchise agreement.

[3] Part of the Curry Real Estate Appraisal discloses that Clark and Alexander did not even own the land at the time of the fax and did not purchase it until July 13, 1993.

at the time the maker signed the note it was distinctly understood that the maker would not have to pay the note is not permitted to compete with the written contents of the note which fails to contain the alleged stipulations.' [Cits.]" *Weintraub v. Cobb Bank & Trust Co.*, 249 Ga. 148, 149 (1) (288 SE2d 553) (1982). Oral representations made as inducements to a contract are inadmissible to add to, take from, or vary a written contract. *C & S Trust Co. (Ga.) v. Johnson*, 201 Ga. App. 464, 465 (411 SE2d 543) (1991). An oral agreement between parties relating to a condition not expressed in a note is incompetent to change the contract as represented on its face. *Devin Lamplighter, Ltd. v. American Gen. Finance*, 206 Ga. App. 747, 749 (2) (426 SE2d 645) (1992) (parol evidence rule prohibits parties from introducing evidence of an alleged oral promise which, if proven, would contradict the terms of a promissory note). OCGA § 24-6-1. See *Cooper v. Mercantile Nat. Bank*, 137 Ga. App. 605, 609 (2) (224 SE2d 442) (1976) (complete and unambiguous instrument cannot be varied by inconsistent parol statements).

In the absence of fraud, accident, or mistake, parol evidence cannot be considered to alter or vary the terms of an unambiguous promissory note. *Johnson*, 201 Ga. App. at 465. But, here, a finding of fraud in the procurement of this note would implicitly mean that the Millers, as borrowers, deceived Commercial Bank and the SBA by testifying falsely in the SBA equity affidavit that "$230,000 in the form of Note to Diane Alexander and Clifford Clark" had been injected into the transaction. Assuming solely for the sake of argument the existence of a side agreement for the repayment of less than the full amount of that note, in light of Boehmig's uncontroverted testimony that the bank would not have extended the loan without the $230,000 note, the Millers should not be able to derive any benefit from their false testimony that they were, in fact, indebted for that amount. See *Lee v. White*, 249 Ga. 99, 101 (1) (c) (286 SE2d 723) (1982); compare *Seymour v. Bruce*, 187 Ga. App. 357, 359 (370 SE2d 210) (1988).

3. DPFI contends that the trial court erred in denying its motion for j.n.o.v. on the issue that it breached the franchise agreement. DPFI claims that the jury was not authorized to find it in breach because the Millers failed to provide written notice and 30 days to cure any such breach as mandated by the terms of the franchise agreement. But those terms applied to a franchisee's right to terminate the agreement and would not foreclose a finding that DPFI breached the agreement. Because the Millers offered some evidence that DPFI breached the agreement by conducting unreasonable inspections and by failing to provide the requisite support services, we must affirm. *F.A.F. Motor Cars v. Childers*, 181 Ga. App. 821 (354 SE2d 6) (1987).

4. DPFI, Clark, and Alexander contend that they were entitled to judgment notwithstanding the verdict on the Millers' intentional infliction of emotional distress claim because no evidence or law supported the jury's verdict. We agree. To prevail on a claim for intentional infliction of emotional distress, a defendant's conduct "must be so extreme . . . as to go beyond all [reasonable] bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Turnbull v. Northside Hosp.*, 220 Ga. App. 883, 884 (2) (470 SE2d 464) (1996). Only where the distress inflicted is so severe that no reasonable person could be expected to endure it does the law intervene. *Peoples v. Guthrie*, 199 Ga. App. 119, 121 (2) (404 SE2d 442) (1991).

In this case, under the franchise agreement DPFI was entitled to make reasonable inspections of the Millers' child care facility. Even assuming arguendo that DPFI's use of nineteen inspections over a six-month period was excessive, "nitpicky" or "burdensome," this is not evidence of outrageousness. See *Peoples*, supra. In fact, some of DPFI's inspection reports give glowing commendations to the Millers while others apparently document some legitimate concerns: failure to submit State-mandated fingerprint cards, children having access to medications, and the failure to label and date food products.

Although the evidence may indicate that DPFI engaged in sharp business practices and may have exerted some pressure on its franchisees, the Millers have not directed our attention to evidence of outrageous conduct. See *Peoples* supra. Having reviewed the evidence adduced at trial, we conclude that the Millers failed to offer any evidence of allegedly wrongful conduct which arose to the requisite level of outrageousness and egregiousness to support a claim for intentional infliction of emotional distress. *Phillips v. Pacific & Southern Co.*, 215 Ga. App. 513, 517 (451 SE2d 100) (1994); *Peoples*, 199 Ga. App. at 121 (2).

5. DPFI contends that as the "prevailing party," it was entitled to attorney fees under the franchise agreement which provides, "[t]he prevailing party shall be entitled to recover reasonable attorneys' fees and court costs [from] the other party." The jury determined that both parties had breached the agreement but awarded $120,403.50 in damages to DPFI and no damages to the Millers. In a separate proceeding, the trial court refused to award attorney fees to either side. Although DPFI has offered no authority precisely on point, we think that it should be deemed the prevailing party. See *Ellis v. Gallof*, 220 Ga. App. 518, 519 (1) (469 SE2d 288) (1996); *Barnett v. Morrow*, 196 Ga. App. 201, 203 (396 SE2d 11) (1990). Therefore, under the franchise agreement, DPFI was entitled to recoup its attorney fees. *Indus. Distrib. Group v. Waite*, 268 Ga. 115, 116 (1) (485 SE2d 792) (1997) (prevailing party may obtain attorney fees when

contract so provides). *Layfield v. Southeastern Constr. Coordinators*, 229 Ga. App. 71, 72 (1) (492 SE2d 921) (1997); *Hope & Assoc. v. Marvin M. Black Co.*, 205 Ga. App. 561 (1) (422 SE2d 918) (1992). Upon return of the remittitur, we direct the trial court to conduct further proceedings for the purpose of determining DPFI's attorney fees relating solely to this claim.

### Case No. A98A1535

In a cross-appeal, the Millers contend that the trial court erred in entering judgment of $107,752.63 under the "actual cost" contract because that judgment is illegal, irrational, inconsistent, and not supported by evidence. We agree and reverse.

*Judgment affirmed in part, reversed in part and case remanded with direction in Case No. A98A1534. Judgment reversed in Case No. A98A1535. Johnson, P. J., and Smith, J., concur.*

DECIDED AUGUST 20, 1998.

*Meadows, Ichter & Trigg, Cary Ichter, Karen R. Cashion*, for appellants.
*Thomas R. Todd, Jr.*, for appellees.