A98A2250. O'NEAL v. HOME TOWN BANK OF VILLA RICA et al.
(514 SE2d 669)

BEASLEY, Presiding Judge.

Banker Fred L. O'Neal originated the idea of a new community bank in Villa Rica and expended significant effort to organize it. In the course of his work he recruited organizers for the bank who allegedly promised and assured him repeatedly that he would be compensated with employment by the bank for at least three years. Near the time it was organized the bank hired O'Neal, without written agreement or formal board approval of a multi-year contract. Four months later and after Home Town Bank of Villa Rica was formed, the board voted to terminate O'Neal, as an employee at will. O'Neal sued the bank and the organizers (collectively "bank") in multiple counts: breach of contract, quantum meruit, fraud, conspiracy, breach of fiduciary duty, intentional and negligent infliction of emotional distress, attorney fees and costs, securities fraud, and defamation, both slander and libel.

O'Neal challenges the grant of summary judgment on each count. Summary judgment is authorized only when all undisputed facts and their reasonable inferences, viewed most favorably to the non-moving party, preclude a triable issue as to at least one essential element of the case.[1]

1. O'Neal contends he had a three-year contract identical to the written contract of the chief financial officer, Laura Cross, with only the salary differing. The salary was to be $65,000 for the first year, $67,500 for the second, and $70,000 for the third. He deposed that the organizers promised to put the agreement in writing but never did. On the other hand, he conceded the organizers asked him to prepare a written contract, but he never presented one to them. O'Neal was hired on March 10, 1997, and was terminated on July 15.

---

[1] OCGA § 9-11-56 (c); *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

There are two alleged agreements: O'Neal's agreement with the organizers that the bank would hire him, and his employment agreement with the bank. Neither is in writing. O'Neal's contract claim fails for three reasons: (1) the agreement to enter into a contract in the future is too vague to be enforced; (2) the employment agreement lacks consideration; and (3) the employment agreement violates the statute of frauds.

O'Neal testified inconsistently about the terms of the agreement with the organizers. He stated he was told he could "have a job here for three years or as long as you want to work here." He said stock options and benefits were to be "very similar to what Laura Cross would have." Although O'Neal also testified his stock options were to be the same as Cross's, at summary judgment self-contradictory statements are to be construed against the non-movant unless he offers a reasonable explanation for the contradiction.[2]

He indicated that the amount of his salary and the structure of his compensation changed over time during the course of the discussions. Even his job description changed. Although he initially believed he would be the chief executive officer and a director, he was eventually hired as the business development officer, and he was not a director. No specific person ever negotiated the details of this proposed contract. He could not recall when an agreement with the organizers was finally reached, and the organizers never voted to approve any written agreement for O'Neal, as they had for the only other two officers with written contracts.

O'Neal's own actions contradict his claims. O'Neal and the other organizers approved the issuance of the bank offering circular on April 21, 1997, a time after he was hired as the business development officer. This document states that "the Organizers have agreed, . . . to cause the Bank to enter into a five year employment contract with the President" and "have also executed an agreement to enter into an employment contract with the Chief Financial Officer." In sharp contrast, the next paragraph states: "Fred O'Neal, an organizer of the Bank, was hired effective March 10, 1997, to serve as the bank's business development planner at an annual salary of $65,000." Although both the president and the CFO had formal agreements, O'Neal had only an "annual salary." The law is that "documents referring to an annual salary merely establish the total amount payable during a twelve-month period and not the duration thereof."[3]

O'Neal's testimony is also vague as to the nature of the alleged

---

[2] *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27 (343 SE2d 680) (1986).

[3] *Gatins v. NCR Corp.*, 180 Ga. App. 595, 597 (349 SE2d 818) (1986), citing *American Standard v. Jessee*, 150 Ga. App. 663, 665 (258 SE2d 240) (1979).

commitment of the organizers. During his deposition, O'Neal characterized the commitment by saying (a) he "was assured that . . . the bank would have employment contracts," (b) "the other understanding was I would have stock options and benefits very similar to what Laura Cross would have," (c) "what I was assured and what I was promised as the thing progressed . . . [was] 'You can still be an employee,'" (d) "I was assured that [I would] have a place here," and (e) "my understanding, my promise was and the assurances was I would be compensated."

At best O'Neal's evidence supports a finding that leading up to the formation of the bank, O'Neal and the organizers repeatedly discussed that once it was formed the bank would hire O'Neal and give him a contract similar to that of the CFO. "Unless an agreement is reached as to all terms and conditions and nothing is left to future negotiations, a contract to enter into a contract in the future is of no effect. [Cits.]"[4] Because the terms of the alleged three-year agreement were not nailed down, it is not enforceable.

Second, O'Neal testified that the consideration he gave in exchange for the three-year employment agreement was his past effort to organize the bank. In *Bankers Trust &c. Co. v. Farmers &c. Bank*,[5] the Supreme Court responded to the following certified question: "'Is a contract entered into by a duly organized bank for the future payment of a salary to its fiscal agent lacking in consideration in so far as the recited consideration relates to "services already rendered and to be rendered in promoting and organizing said bank?"'" The answer is yes.[6] The Court reasoned that past consideration generally will not support a subsequent promise, and the situation presented was no exception.[7] This is so in part because the purported consideration was not rendered to the bank which had yet to be established when the promotion and organization took place.[8] These services perhaps were rendered to benefit the organizers, but as shown above the agreement with the organizers is not enforceable.

Third, "a verbal contract for services to begin in the future and continue for a year [or more] is void under the Statute of Frauds."[9] O'Neal argues his agreement is not void because it was either fully or

---

[4] *Malone Constr. Co. v. Westbrook*, 127 Ga. App. 709 (194 SE2d 619) (1972). See also *Hartrampf v. C & S Realty Investors*, 157 Ga. App. 879, 881 (1) (278 SE2d 750) (1981) (where certain terms were to be negotiated in the future the agreement lacked sufficient specificity to be enforced).

[5] 163 Ga. 352 (136 SE 143) (1926).

[6] Id.

[7] Id. at 352-353; see also *Whitmire v. Watkins*, 245 Ga. 713, 714 (267 SE2d 6) (1980) (promise made after alleged consideration was given does not create contract).

[8] *Bankers Trust*, 163 Ga. at 353.

[9] *Katz v. Custom Spray Products*, 168 Ga. App. 451, 452 (309 SE2d 663) (1983); OCGA § 13-5-30 (5).

partially performed and had been accepted by the organizers.[10]

As for full performance, O'Neal argues that his past promotional activities were fully completed and they constitute performance of his part of the agreement with the organizers. Again, the agreement with the organizers is too vague to be enforced, and the past consideration is inadequate to establish the alleged employment agreement with the bank.

O'Neal points to the four months he was employed as constituting partial performance sufficient to avoid the statute of frauds. But "oral employment contracts for longer than one year are unenforceable unless there has been part performance that is 'consistent with the presence of a contract and inconsistent with the lack of a contract.' [Cit.]"[11] In *Baxley Veneer* the Supreme Court held that leaving one job to begin another and working for two years is not sufficient part performance to remove an oral employment contract from the operation of the statute of frauds.[12] The same underlying principle applies here.

2. O'Neal's claim of quantum meruit is illogical. O'Neal was paid his salary for the four months that he was employed as the business development officer and thus has no claim of quantum meruit for that time. He claims he is entitled to compensation from the other organizers for his year-long effort to organize the bank.

OCGA § 9-2-7 provides: "Ordinarily, when one renders service or transfers property which is valuable to another, which the latter accepts, a promise is implied to pay the reasonable value thereof." But

> "[t]he law will not imply a promise to pay for services contrary to the intention of the parties. There can be no recovery for services rendered voluntarily and with no expectation at the time of the rendition that they will be compensated. . . . Under such circumstances no obligation . . . is incurred. A subsequent change of intention by the parties performing the services does not alter the rule. [Cit.]"[13]

O'Neal takes credit for having the idea to form a new bank and

---

[10] See OCGA § 13-5-31.

[11] *Baxley Veneer &c. Co. v. Maddox,* 261 Ga. 309 (1) (404 SE2d 554) (1991). See also *Ikemiya v. Shibamoto America,* 213 Ga. App. 271 (444 SE2d 351) (1994) (referring customers and a customer list to the employer was insufficient part performance to remove employment agreement from the statute of frauds).

[12] *Baxley Veneer,* 261 Ga. 309.

[13] (Emphasis omitted.) *Smith Dev. v. Flood,* 198 Ga. App. 817, 820-821 (403 SE2d 249) (1991).

for putting in the effort necessary to organize it. There is no evidence he had reason to believe he would be compensated for this voluntary undertaking. Baseless is an implied promise by the other organizers to compensate O'Neal for his organizational efforts, just as there is no basis for an implied promise that O'Neal or the bank would compensate the other organizers for their efforts.

O'Neal cannot say when the parties allegedly entered into an agreement with the organizers. The terms of any such agreement were in doubt at least as late as February 1997 when he learned that he could not be a director. Although he considered withdrawing at that time, he accepted a position as business development planner on March 10. The bank was incorporated on March 24. O'Neal has not identified any effort on his part to organize the bank subsequent to the formation of an implied agreement.

Nor does the bank itself owe O'Neal for his organizational efforts, which preceded the bank's actual organization. No bank then existed which could be a party to an implied obligation to compensate O'Neal for those efforts.

Finally, OCGA § 7-1-391 (a) provides:

A bank or trust company shall not pay any fee, compensation, or commission for promotion in connection with its organization or apply any money received on account of shares or subscriptions, selling shares, or other services in connection with its organization, except legal fees and other usual and ordinary expenses necessary for its organization.

An agreement prohibited by law cannot be the basis for a claim of quantum meruit.[14] O'Neal presents no authority for a claim that he is exempt from the effect of this statute.

3. O'Neal claims the organizers and the bank are liable for fraudulently inducing him to continue his efforts on behalf of the bank by promising three years guaranteed employment. Divisions 1 and 2 in effect reject this. Fraud cannot be based on an unenforceable promise.[15] *Plane v. Uniforce MIS Svcs.*[16] is not on point. It involved a representation to plaintiff about the existence of a contract between defendant and a third party, not plaintiff.

4. Likewise, summary judgment was warranted on O'Neal's con-

---

[14] *Sapp v. Davids*, 176 Ga. 265 (168 SE 62) (1933) (where agreement for attorney fees is void, claim of quantum meruit for the same services is improper because the implied agreement is void in its inception).

[15] *Godwin v. City of Bainbridge*, 172 Ga. App. 290, 292 (2) (322 SE2d 733) (1984); *Presto v. Scientific-Atlanta*, 193 Ga. App. 606, 607 (3) (388 SE2d 719) (1989) (unreasonable to rely on unenforceable promise).

[16] 232 Ga. App. 757 (503 SE2d 621) (1998).

spiracy claim. Absent the underlying tort, there can be no liability for civil conspiracy.[17]

5. Summary judgment was proper on the claim of breach of fiduciary duty, i.e., that O'Neal was entitled to rely on assurances by his fellow organizers that he would have a three-year employment contract.

The party asserting the existence of a fiduciary or confidential relationship bears the burden of establishing its existence.[18]

> A confidential relationship may exist between business people, depending on the facts. [Cit.] However, the mere circumstance that two people have come to repose a certain amount of trust and confidence in each other as the result of business dealings is not, in and of itself, sufficient to find the existence of a confidential relationship. [Cits.][19]

*Vitner v. Funk*[20] addressed the question of whether plaintiff and defendant doctors enjoyed a fiduciary relationship in connection with their joint efforts to establish a birthing center for deliveries by midwives. The court held the issue was properly presented to the jury based on "ample evidence to sustain a finding that the parties embarked on a joint enterprise, share and share alike" and "evidence that the parties assumed the role of incorporators or 'promoters' and as such acquired the rights and responsibilities commensurate with their status."[21] The court approved the jury's finding that the defendant doctors had an obligation to share ownership of the new corporation with the plaintiff.

This case is distinguishable from *Vitner*. First, O'Neal admitted there was never a partnership agreement among the organizers and that they operated on what could be described as "a handshake" in organizing the bank. O'Neal is a shareholder in the bank, a logical result of his joint effort with fellow organizers to establish a new bank. Second, his employment is a different transaction. As in an earlier case, "[a]lthough the parties may have owed each other a fiduciary duty in other respects, there is no basis . . . for an inference that a fiduciary or confidential relationship existed between them with respect to the transaction at issue."[22]

---

[17] *Savannah College of Art &c. v. School of Visual Arts of Savannah*, 219 Ga. App. 296, 297 (464 SE2d 895) (1995); *Cook v. Robinson*, 216 Ga. 328 (1) (116 SE2d 742) (1960).

[18] *Parello v. Maio*, 268 Ga. 852, 854 (1) (494 SE2d 331) (1998); *Crawford v. Crawford*, 134 Ga. 114, 119 (67 SE 673) (1910).

[19] *Parello*, 268 Ga. at 853 (1). See also OCGA § 23-2-58.

[20] 182 Ga. App. 39 (354 SE2d 666) (1987).

[21] Id. at 42-43 (2).

[22] *Kienel v. Lanier*, 190 Ga. App. 201, 204 (2) (378 SE2d 359) (1989).

When O'Neal first formed the idea of a new bank he may have hoped he would be a long-time employee. Once the organizers assembled, they all worked toward the common goal of forming it. O'Neal raised the issue of his future employment on numerous occasions, but it was not the organizers' common goal to employ him. Foundationless was O'Neal's belief that just because he was largely responsible for assembling the group, he could rely on assurances from them that he would be guaranteed a multi-year employment agreement. Summary judgment was proper.[23]

6. No claim for negligent infliction of emotional distress can go forward because "[i]n a claim concerning negligent conduct, a recovery for emotional distress is allowed only where there is some impact on the plaintiff, and that impact must be a physical injury."[24]

> To prevail on a claim for intentional infliction of emotional distress, a defendant's conduct "must be so extreme . . . as to go beyond all (reasonable) bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." [Cit.] Only where the distress inflicted is so severe that no reasonable person could be expected to endure it does the law intervene. [Cit.][25]

The record is devoid of any such evidence.

7. Securities fraud is absent because no document prepared in connection with offering stock can be construed to indicate O'Neal had a guaranteed three-year employment contract, no other suggestions of fraud are made, and O'Neal purchased stock after he had been employed without a written agreement.

8. Months after O'Neal was terminated and weeks after this suit was filed, the president of the bank sent a letter to the bank's 900 shareholders quoting from its verified answer to the complaint. O'Neal contends several statements made in that quotation are libelous and defamatory. He amended his complaint accordingly.

The bank asserts that because the quotation was taken from the pleadings it is absolutely privileged under OCGA § 51-5-8. But the statement was made in a widely distributed letter communicating the contents of a court proceeding. It is not itself a pleading. As a letter, it is protected only by one of the conditional privileges defined

---

[23] See *Harish v. Raj*, 222 Ga. App. 248, 250 (1) (474 SE2d 624) (1996) (affirming trial court's summary judgment to defendant on issue of confidential relationship).

[24] *Ryckeley v. Callaway*, 261 Ga. 828 (412 SE2d 826) (1992).

[25] *Discovery Point Franchising v. Miller*, 234 Ga. App. 68, 73 (4) (505 SE2d 822) (1998). See also *Borden v. Johnson*, 196 Ga. App. 288, 290-291 (2) (395 SE2d 628) (1990) (generally there can be no recovery in tort for wrongful termination of an at-will employee and therefore no claim for intentional infliction of emotional distress).

in OCGA § 51-5-7. "From motives of public policy the law recognizes certain communications and publications as privileged . . . either absolute[ly], entirely freeing the party from any liability to the person injured by the words or the publication, or conditional[ly], that is, the words shall be spoken in good faith, upon a proper occasion. When the privilege is absolute, the motive of the publication is immaterial. When the privilege is conditional actual malice will bring about liability."[26] With an absolute privilege " 'the question of malice is not open; all inquiry into good faith is closed.' "[27]

Statutory construction of OCGA §§ 51-5-7 and 51-5-8, together with a consideration of the policy underlying these privileges, establishes that publishing quotations from pleadings in such a letter is protected only by a conditional privilege.

OCGA § 51-5-8 grants an absolute privilege to "[a]ll charges, allegations, and averments contained in regular pleadings filed in a court of competent jurisdiction. . . ."

> It is clear from a review of past decisions that, . . . we have not strictly limited the privilege under OCGA § 51-5-8 to "pleadings" as they are defined under OCGA § 9-11-7 (a). Rather, the absolute privilege afforded by OCGA § 51-5-8 has been more broadly construed to cover a notice of lis pendens, an affidavit in support of an arrest warrant, and the words of a judge in the course of a judicial proceeding. [Cits.] Indeed, we have generally described the coverage of the privilege to include "official court documents" and acts of "legal process." [Cits.][28]

But the absolute privilege has not been extended to publishing the contents of official court documents outside the judicial process. That is covered by the conditional privileges found in OCGA § 51-5-7. For example, there are privileges for statements made in good faith in the performance of public, legal or moral private duties, OCGA § 51-5-7 (1) and (2), statements made with a good faith intent to protect one's interest, OCGA § 51-5-7 (3), fair and honest reports of court proceedings, OCGA § 51-5-7 (6), and fair comments of counsel on the circumstances of a case, OCGA § 51-5-7 (7). These privileges by their

---

[26] *Atlanta News Publishing Co. v. Medlock*, 123 Ga. 714, 719 (51 SE 756) (1905).

[27] Id.

[28] *Williams v. Stepler*, 227 Ga. App. 591, 595 (3) (490 SE2d 167) (1997) (draft protective order). See also *Cleveland v. Williamson*, 194 Ga. App. 476 (1) (391 SE2d 22) (1990) (petition for appointment of a guardian). Compare *Bell v. Anderson*, 194 Ga. App. 27, 29 (389 SE2d 762) (1989) (construction of this phrase has not been expanded to include "communications made by an attorney in court or to opposing counsel or opposing parties preceding or in the course of litigation").

terms more aptly cover publication of pleadings outside judicial proceedings than does OCGA § 51-5-8. For instance, although a party is absolutely privileged to make false and malicious statements in a pleading, a newspaper is privileged to report the pleading only if it "fully, fairly, and accurately [presents] an impartial account of the proceedings."[29]

The policy behind the absolute privilege supports this conclusion. The absolute privilege for pleadings

> rests on public policy, which allows all suitors (however bold and wicked, however virtuous and timid,) to secure access to the tribunals of justice with whatever complaint, true or false, real or fictitious, they choose to present, provided only that it be such as the court whose jurisdiction is invoked has power to entertain and adjudicate.[30]

Accordingly, absolute privilege " 'is restricted to narrow and well-defined limits' " because in the name of the public good it can protect the alleged defamer from false and malicious publication.[31] There is no evidence that not sending the letter to the shareholders would have hindered the bank's access to the courts. The eyes of the court must be open wide and its ears must remain unstopped, so that injustice may be revealed, but the rationale for this accommodation does not extend to others.

Even so, as a control on the misuse of absolute privilege, the law allows suits for "malicious use of civil process, malicious abuse of legal process, or malicious prosecution," now all subsumed in OCGA § 51-7-81.[32] This section applies only to "[a]ny person who takes an active part in the initiation, continuation, or procurement of civil proceedings,"[33] not to a person who publishes a libelous letter.

The remedy for misuse of a conditional privilege is OCGA § 51-5-9. "[I]f the privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted, the party defamed shall have a right of action."[34]

---

[29] (Punctuation omitted.) *Shiver v. Valdosta Press*, 82 Ga. App. 406, 412 (61 SE2d 221) (1950).

[30] *Wilson v. Sullivan*, 81 Ga. 238, hn. 1 (7 SE 274) (1888).

[31] *Davis v. Shavers*, 225 Ga. App. 497, 500 (484 SE2d 243) (1997), quoting *Fedderwitz v. Lamb*, 195 Ga. 691, 696 (25 SE2d 414) (1943).

[32] *Dixie Broadcasting Corp. v. Rivers*, 209 Ga. 98, 107 (6) (a) (70 SE2d 734) (1952); OCGA § 51-7-85 (OCGA § 51-7-80 et seq. is exclusive remedy for abusive litigation).

[33] See also OCGA § 51-7-82 (it is a defense to withdraw the "civil proceeding, claim, defense, motion, appeal, civil process, or other position." No mention of actions taken outside the judicial proceeding.).

[34] OCGA § 51-5-9; *Davis v. Shavers*, 225 Ga. App. at 498-499 (1) (use of conditional privilege requires "a showing of good faith and good intention as essential ingredients of the privilege"), aff'd, 269 Ga. 75 (495 SE2d 23) (1998).

"Generally both the question of whether the communication was privileged and whether it was uttered maliciously are jury questions."[35] This remedy logically applies to the present case.

*Phillips v. MacDougald*[36] is distinguishable because there was no libel claim, and it is unclear whether the pleader quoted his own pleadings to the press, or the press quoted the pleadings and attributed it to the pleader.

The letter stated in part that "[t]he decision to terminate O'Neal from this position was made for a number of reasons, including . . . O'Neal's complete failure to perform the limited duties he was being paid to perform." According to the bank, one duty was to sell stock in the newly formed bank. The minutes of the organizers' July 2, 1997 meeting record congratulations to O'Neal on the amount he had collected toward his stock sales goal. Issues of fact remain as to whether the statement in the letter, and other statements, were intentionally false, and whether defendants acted in good faith in publishing the letter to the shareholders.

The bank also offers as a defense that the statement was never published, a requirement for a claim for slander or libel, because it was sent only to bank shareholders. *Kurtz v. Williams*[37] is relied on, which states: "when the communication is intra-corporate, or between members of unincorporated groups or associations, and is heard by one who, because of his/her duty or authority has reason to receive the information, there is no publication of the allegedly slanderous material, and without publication, there is no cause of action for slander." This rule is based on the legal fiction that such statements are the legal equivalent of speaking only to one's self.[38] When the statement is sent to someone outside the limited group, a showing of malice will establish a right to damages.[39]

In most cases applying the rule, intra-corporate means among the officers or employees who have a direct duty and authority to know the information.[40] Typically a handful of management employ-

---

[35] *Cohen v. Hartlage*, 179 Ga. App. 847, 849 (348 SE2d 331) (1986).

[36] 219 Ga. App. 152, 155 (2) (c) (464 SE2d 390) (1995).

[37] 188 Ga. App. 14, 15-16 (371 SE2d 878) (1988).

[38] Id.

[39] *Melton v. Bow*, 241 Ga. 629 (247 SE2d 100) (1978); *Kurtz*, 188 Ga. App. at 16 (3).

[40] See, e.g., *Terrell v. Holmes*, 226 Ga. App. 341, 343 (487 SE2d 6) (1997) (one of five vice presidents had particular responsibilities giving him reason to be advised and consulted on matter in issue); *Fly v. Kroger Co.*, 209 Ga. App. 75, 77 (1) (432 SE2d 664) (1993) (managers with duty and authority to receive information about allegedly improper actions, and a union representative, whom defamed invited and who had duty to be present); *ITT Rayonier v. McLaney*, 204 Ga. App. 762, 764-765 (2) (420 SE2d 610) (1992) (supervisory personnel and/or a personnel department representative); *Green v. Sun Trust Banks*, 197 Ga. App. 804, 809 (4) (a) (399 SE2d 712) (1990) (same); *Kurtz*, 188 Ga. App. 14 (hospital managers with responsibility over issue raised). See also *Carter v. Willowrun Condo. Assn.*, 179 Ga. App.

ees have conferred about another employee to determine the course of action to take in response to allegations about the employee's conduct.[41] One case applied the rule to a related corporate entity with scant explanation of the duties involved and thus does not control our decision.[42]

Application of this rule has never been extended to shareholders of a corporation. *Zielinski v. Clorox Co.*[43] made clear that statements made at an all-plant meeting were "published" for libel purposes, where all employees of the company did not have a duty or authority to receive the information.[44] Being an employee or shareholder without more is not enough to support application of the "intra-corporate" rule.

> [A]lthough shareholders have some rights to corporate information not available to the general public, shareholder status does not in and of itself entitle an individual to unfettered access to corporate confidences and secrets. . . . [S]hareholders have less right to acquire corporate information than do directors.[45]

A shareholder has a right to inspect the corporation's records if: (1) the shareholder's demand is made in good faith, for a proper purpose; (2) he describes with reasonable particularity his purpose and the records he desires to inspect; (3) the records are directly connected with his purpose; and (4) the records are to be used only for the stated purpose.[46]

The bank failed to present any evidence of a duty or authority of the 900 shareholders to be informed of the details of the litigation. There is no indication they were consulted about the answer before it was filed or about any other matters related to the case. There is no indication they requested or required the information.

---

257, 258 (1) (345 SE2d 924) (1986) (communication was made only to one who had reason to receive information which concerned her property, income, and duties and responsibilities to condominium association).

[41] See n. 40, supra.

[42] See, e.g., *Kitchen Hardware, Ltd. v. Kuehne & Nagel*, 205 Ga. App. 94, 96 (2) (421 SE2d 550) (1992) ("an affiliated corporate branch" of a corporation).

[43] 215 Ga. App. 97, 98 (1) (450 SE2d 222) (1994).

[44] Compare *Davis v. Copelan*, 215 Ga. App. 754, 765 (4) (452 SE2d 194) (1994) (statement made between hospital employees with law enforcement officer present was published); *Elder v. Cardoso*, 205 Ga. App. 144, 146 (2) (421 SE2d 753) (1992) (statement by doctor to four patients was published).

[45] (Citation and punctuation omitted.) *Riser v. Genuine Parts Co.*, 150 Ga. App. 502, 504 (258 SE2d 184) (1979) (burden on stockholder becomes heavier as document becomes increasingly remote from " 'books and records of account, minutes and record of shareholders' ").

[46] OCGA §§ 14-2-1604; 14-2-1602.

Finally, the shareholders and the bank are not one and the same, and therefore the legal fiction that there was no publication because the bank made the statement to itself is inapplicable. "It can be said that the cardinal rule of corporate law is that the corporation possesses a legal existence separate and apart from that of its officers, employees, shareholders and directors."[47]

There remains an issue of fact as to good faith and the need to inform the shareholders of the detailed allegations contained in court pleadings involving one terminated employee. Most shareholders are from Villa Rica and know O'Neal. A jury could find that the bank maliciously repeated known falsehoods in the letter to the shareholders who had no duty or authority to be privy to the details of this suit. The libel claim is viable.

On the other hand, O'Neal's claim of slander is unsupported by any evidence, as explained in the appellees' brief.

9. Summary judgment was correct on the request for costs and fees with respect to all claims except libel, for the reason those claims were not sound. As to libel "[e]very intentional tort invokes a species of bad faith that entitles a person wronged to recover the expenses of litigation including attorney fees."[48] If libel is found, a jury could also honor this claim. To that extent summary judgment was premature.

In sum, what remains for trial are the claims of libel and corresponding costs and fees.

*Judgment affirmed in part and reversed in part. Pope, P. J., and Ruffin, J., concur.*

DECIDED MARCH 12, 1999 —
RECONSIDERATION DENIED MARCH 30, 1999.

*Sutherland, Asbill & Brennan, Richard L. Robbins, Lisa C. Foster, Charles B. Jones III*, for appellant.

*Tisinger, Tisinger, Vance & Greer, David H. Tisinger, Steven T. Minor*, for appellees.

---

[47] (Citation and punctuation omitted.) *Raynor v. American States Ins. Co.*, 176 Ga. App. 564, 565 (337 SE2d 43) (1985).

[48] *DeKalb County v. McFarland*, 231 Ga. 649, 651 (1) (b) (203 SE2d 495) (1974).