**FIRST DIVISION**
**BARNES, P. J.,**
**MERCIER and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 30, 2019**

# In the Court of Appeals of Georgia

A19A0964. AGSOUTH FARM CREDIT, ACA v. WEST et al.

BARNES, Presiding Judge.

When AgSouth Farm Credit, ACA did not extend loans to Jason West and Chris West in amounts that would have totaled more than $2,000,000, they sued the lending cooperative accusing it of causing them to experience hardships and losses. AgSouth moved for summary judgment on all claims, but the trial court denied the motion. For reasons that follow, the judgment is vacated in part and reversed in part, and the case is remanded with direction.

Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[.]" OCGA § 9-11-56 (c). "In our de novo

review of the grant [or denial] of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant." (Citation and punctuation omitted.) *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010); *Norton v. Budget Rent A Car System*, 307 Ga. App. 501, 501 (705 SE2d 305) (2010) (we review the denial of summary judgment de novo, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party).

So viewed, the evidence showed the following. In 2005, Jason West and Chris West (the "Wests"), together with their father, formed West Farms, Inc., through which they farmed primarily cotton and peanuts across roughly 2,000 acres in Tattnall and Candler Counties. Approximately 1,600 of those acres were leased from numerous landowners on handshake deals; the remaining acreage of the land farmed was owned by the Wests' father.

Starting in about 2013, West Farms experienced a series of poor financial years. In his deposition, Chris West described, "2013 was not very good. 2014 was a mediocre year. 2015 was not good." By "mediocre," as Chris West added, "I mean we . . . got by, but we weren't making money." Jason West similarly described in his deposition that 2014 was a "bad"/"break even" year, and that 2015 was a "harsh year"

2

that culminated in a large loss. He also recounted that in either 2013 or 2014, West Farms borrowed from Pineland Bank over $800,000 as operating funds; and in connection with the debt owed to Pineland, the farmed land owned by the Wests' father eventually served as collateral. With respect to 2015, as the West Farms' accountant deposed, the company lost $717,414.

During that time period, West Farms turned to AgSouth, a member-owned agricultural lender with the objective of, among other things, ensuring the availability of sound and adequate credit to bona fide farmers. In particular, for two years, West Farms procured from AgSouth annual operating loans of $900,000. As background for those loans, Chris West explained during his deposition, "[I]t's renewed every year. And you pay back the principal or the 900,000 plus interest you pay back every year and then it's renewed yearly."

The instant litigation stems primarily from what happened when the Wests sought to borrow funds from AgSouth in 2016. By that point, West Farms had amassed substantial debt. As Chris West deposed, "[T]he problem was we had had some bad years and we owed some money to Growers Supply[1] and we owed money to Pineland Bank and we needed to get that set up on some long-term financing."

---

[1] Jason West deposed that the Growers Supply debt included "seed cost."

3

Recalling that the bulk of that "long-term" debt was owed to Pineland Bank, Chris West described how the nearly $800,000 debt had accumulated: "Some of it was a piece of land that my dad purchased that still had money owed on it. Some of it was equipment that had money owed on it and we used Pineland Bank to buy some equipment and it was still – and then some of it was loss due to poor farming years." The combined "long-term" debt, as Chris West recalled, was approximately $1,050,000. In addition to these "long-term" creditors, West Farms' owed numerous other creditors – including John Deere Financial ($170,000) and/or Farm Plan ($170,000); Triangle Chemical ($20,000); Claxton Oil ($9,000); C & H Credit; Rabo AgriFinance ($20,000); as well as AgSouth.[2]

Hence, by mid-2016, the Wests had approached AgSouth's employee Rodney Fowler about borrowing funds sufficient not only to cover the upcoming annual operations, but also to refinance West Farms' "long-term" debt and buy out their father's interest in West Farms. To that end, Jason West and Chris West each sought

---

[2] The record shows deposition testimony that the "Farm Plan" debt was mostly for fertilizer; the Triangle Chemical debt related to agricultural chemicals; the Claxton Oil debt was for diesel fuel; the C & H Credit account related to equipment refinancing; and the Rabo AgriFinance debt was for cotton seed.

4

to borrow from AgSouth $1,100,000.[3] Accounting for the bulk of the anticipated amount, Jason West deposed, "I was going to get $450[,000] worth of operating money. . . [and] $550,000 worth of long-term money. Chris would have gotten the same." As Jason West elaborated in his deposition,

> The whole deal of this loan that we are discussing was we were going to buy the farm from [D]addy and refinance it long-term. Get [D]addy completely out of it, let him retire. We could long-term what we owed out on the Pineland Bank and Growers and be able to make it work. That was what we were – direction we were heading at. So, it would have been – still been West Farms, but it would have been Chris and Jason operating it instead of [D]addy being involved. . . . [T]he operating loan wouldn't have been in place as West Farms, it would have been as individuals then.

Fowler deposed, "I felt confident we could close by the end of February." As he and the Wests worked toward that goal, they engaged in numerous discussions about, among other things, West Farms' open accounts, the creditors, and various requirements for obtaining $2.4 million in new loans.[4] In addition, Fowler ordered an

---

[3] Jason West deposed that he and his brother anticipated loans in the amount of $1,100,000; Fowler deposed that the contemplated loan amount was $1,200,000 for each of the Wests.

[4] See footnote 3, supra.

5

appraisal of the farm as a whole; he also communicated directly with certain of West Farms' creditors, including inquiring about "an extension [from Pineland] to allow us more time to accomplish what we were trying to accomplish." Regarding the latter, Fowler explained, "I was hoping Pineland was going to be able to help out the Wests."

Notwithstanding the efforts of all parties, Fowler informed the Wests in mid-February 2017 that AgSouth would not be able to extend them any loan(s) at that time. When Fowler was asked during his deposition why the loan(s) had not closed, he responded, "It was an incomplete application due to coming up short on their operating loan and they were unable to tell me their accounts receivable to be able to pay off their operating loan. And open accounts that I discovered in February of '17." According to Fowler, the Wests had failed to timely provide full and complete information about West Farms' financial circumstances.

But according to the Wests, they wholly complied with each of Fowler's ongoing requests; and all the while, Fowler had assured them that their loans would close in February 2017; because of their reliance upon Fowler's representations, they had sought no alternative financing; and when Fowler ultimately declined to extend them loans, he had provided them with no explanation.

In their lawsuit against AgSouth, the Wests alleged that they were members of AgSouth; and that they were thus entitled to have fiduciary care extended to them by AgSouth in all transactions between them. The Wests complained that, because of AgSouth's improper actions, they defaulted on several loans, lost leaseholds upon land that generated 80 percent of their income, were ousted from several farming committees and boards (because they were no longer able to farm); and their "family farm [was] on the verge of foreclosure." Seeking damages from AgSouth, the Wests advanced substantive claims of breach of fiduciary duty, negligence, breach of oral contract, promissory estoppel, and fraud.

AgSouth admitted in its answer that the Wests – having cosigned on a loan to West Farms – were members of AgSouth; and that "[the Wests] may be afforded certain borrower rights pursuant to the Farm Credit Act of 1971, as amended, and its accompanying regulations."[5] Notwithstanding, AgSouth denied liability as to each of the Wests' claims. After a discovery period, AgSouth moved for summary judgment on all claims advanced against them, and Wests filed opposition thereto. The trial

---

[5] See generally 12 USC 2001 et seq.

court conducted a hearing,[6] then denied the motion. In this interlocutory appeal, AgSouth argues that it was entitled to summary judgment as follows.

1. AgSouth contends that the trial court erred in denying it summary judgment on the Wests' claim of breach of fiduciary duty, maintaining that it owed the Wests no such duty.

"A claim for beach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." (Punctuation and footnote omitted.) *All Bus. Corp. v. Choi*, 280 Ga. App. 618, 621 (1) (634 SE2d 400) (2006). The party "asserting the existence of a fiduciary or confidential relationship bears the burden of establishing its existence." *O'Neal v. Home Town Bank*, 237 Ga. App. 325, 330 (5) (514 SE2d 669) (1999).

> A fiduciary or confidential relationship arises where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc. Such relationship may be created by law, contract, or the facts of a particular case. Moreover, since a confidential relationship may be found whenever one

---

[6] The appellate record does not contain a transcript of this hearing.

party is justified in reposing confidence in another, the existence of this relationship is generally a factual matter for the jury to resolve.

(Citations and punctuation omitted.) *Douglas v. Bigley*, 278 Ga. App. 117, 120 (1) (a) (628 SE2d 199) (2006).

In its order, the trial court articulated: "At issue are whether a duty was created by any membership agreement, or by duties owed all members in the AgSouth organization, and/or by the host of communications which took place over the months long period at issue." In denying AgSouth's summary judgment motion, the trial court cited "obligations imposed by a membership based relationship." The court added, "If membership has its benefits, perhaps one of them is a higher duty. . . ."

But nothing about the parties' "membership based relationship" imposed as a matter of law a fiduciary duty upon AgSouth. As a general matter, "[c]reditors deal with debtors at arm's length, and do not stand in a fiduciary capacity in relationship to the debtor." (Citations and punctuation omitted.) *Straus v. Renasant Bank*, 326 Ga. App. 271, 276 (2) (a) (756 SE2d 340) (2014). As the Supreme Court of Georgia has long held, "[i]n the majority of business dealings, opposite parties have trust and confidence in each other's integrity, but there is no confidential relationship by this alone." *Dover v. Burns*, 186 Ga. 19, 26 (196 SE2d 785) (1938). And more recently,

9

[t]his Court, in *Pardue v. Bankers First Fed. Sav. &c. Assn.*, 175 Ga. App. 814 (334 SE2d 926) (1985), explained why such a relationship cannot be found, absent special circumstances . . . , by stating that there is "particularly no confidential relationship between lender and borrower or mortgagee and mortgagor for they are creditor and debtor with clearly opposite interests."

(Citation and emphasis omitted.) *Moore v. Bank of Fitzgerald*, 225 Ga. App. 122, 125-126 (2) (483 SE2d 135) (1997). See also *First American Bank v. Bishop*, 239 Ga. 809, 809 (239 SE2d 19) (1977) ("A confidential relationship does not arise between a bank officer and the bank's customer merely because they . . . have had loan transactions in the past."); *O'Neal*, 237 Ga. App. at 330 (5) ("[T]he mere circumstance that two people have come to repose a certain amount of trust and confidence in each other as the result of business dealings is not, in and of itself, sufficient to find the existence of a confidential relationship.").

While Georgia has not previously ruled upon the particular "membership based relationship" identified here, we agree with those foreign jurisdictions that have specifically held that membership in an agricultural lending cooperative, such as AgSouth, does not automatically give rise to a fiduciary relationship. See *Burgmeier v. Farm Credit Bank of St. Paul,* 499 NW2d 43, 51 (III) (Minn. Ct. App. 1993)

10

(holding that, while a fiduciary relationship may exist between a Farm Credit Act lender and its farm-borrower, such relationship "does not exist as a matter of law," but "requires a showing of special circumstances demonstrating a departure from the lender-borrower relationship"); *Yoest v. Farm Credit Bank of St. Louis,* 832 SW2d 325, 329 (Mo. Ct. App. 1992) ("The [family farmers'] membership in [Central Production Credit Association] is not a basis for a fiduciary relationship. A fiduciary relationship between borrower and lender does not arise because the borrowers are members or shareholders in a production credit association, absent a showing of special circumstances."); *Production Credit Assn. of Fargo v. Ista,* 451 NW2d 118, 121 (I) (N.D. 1990) (rejecting the farmers' "novel" theory that "PCA [Production Credit Association of Fargo], in all of its loan transactions, owes a fiduciary duty to its borrowers arising solely out of their status as stockholders in PCA"; reiterating that "[w]hether a fiduciary relationship exists is . . . dependent upon a showing of special circumstances"). Thus, contrary to the apparent underpinnings of the trial court's ruling, no fiduciary duty attached based solely upon the parties' "membership based relationship."

Seeking affirmance of their favorable ruling nonetheless, the Wests assert that various factual circumstances in this case, including certain communications made

11

and actions undertaken by Fowler in connection with the anticipated loan(s), authorized a finding that a fiduciary relationship existed. Indeed, where the "fiduciary or confidential relationship is not created by law or contract, [a court] must examine the facts of a particular case to determine if such a relationship exists." (Citation and punctuation omitted.) *Middleton v. Troy Young Realty*, 257 Ga. App. 771, 773 (a) (572 SE2d 334) (2002). AgSouth counters that the Wests did not discharge its burden below by pointing to specific evidence – whether "based on the Wests' status as members of AgSouth or otherwise" – giving rise to such a finding.

The trial court's ruling on the summary judgment motion, however, did not reach the ground urged by the Wests here. And given the circumstances, we exercise our discretion to vacate the denial of the summary judgment motion as to the breach of fiduciary duty claim and remand this case for the trial court to determine in the first instance whether the Wests pointed to specific evidence of Fowler's conduct that transcended the lender-borrower relationship customarily found between a member-owned agricultural lender and farm operator and thereby showed a triable issue as to the existence of a fiduciary relationship.[7] See *City of Gainesville v. Dodd*, 275 Ga.

---

[7] See generally *Mantooth v. Federal Land Bank of Louisville*, 528 NE2d 1132, 1138-1139 (III) (Ind. Ct. App. 1988); *Production Credit Assn. v. Croft*, 423 NW2d 544, 545-548 (II) (Wis. Ct. App. 1988).

834, 838-839 (573 SE2d 369) (2002) (holding that appellate courts retain discretion in determining whether to apply the right-for-any-reason rule and consider alternative legal theories not addressed by the trial court, or to vacate order and remand for the trial court to consider alternative legal theories in the first instance); *Zhong v. PNC Bank, N.A.*, 334 Ga. App. 653, 655-656 (2) (780 SE2d 92) (2015) (reversing summary judgment ruling and remanding case, where ruling was based on an erroneous legal theory and the trial court did not address all arguments advanced); *Strength v. Lovett*, 311 Ga. App. 35, 44-45 (2) (b) (714 SE2d 723) (2011) (remanding question not reached by trial court); *DuPree v. South Atlantic Conference of Seventh Day Adventists*, 299 Ga. App. 352, 355 (683 SE2d 1) (2009) (remanding where "trial court did not rule upon the other grounds advanced by [party] in its motion for summary judgment").

2. AgSouth contends that the trial court erred by denying their summary judgment motion as to the Wests' negligence claim, arguing that the Wests failed to demonstrate a requisite duty.[8]

---

[8] "[T]o recover for injuries caused by another's negligence, a plaintiff must show four elements: a duty, a breach of that duty, causation and damages." (Citation and punctuation omitted.) *Goldstein, Garber & Salama v. J. B.*, 300 Ga. 840, 841 (1) (797 SE2d 87) (2017).

In their complaint, the Wests alleged that "AgSouth failed, neglected or refused to fully and properly discharge their duties and obligations, and failed, neglected or refused to exercise that degree of care, skill, diligence, obedience to its standards published for the benefit of Plaintiffs required. This failure constitutes negligence." When the Wests were thereafter confronted with AgSouth's summary judgment challenge as to the duty element, they responded that "Fowler failed to comply with the privately established guidelines" that required an AgSouth employee processing a loan application to timely apprise its members of any outstanding items needed. The Wests elaborated, "[A]lthough [they] dispute that the application was incomplete, it is clear that Fowler failed to comply with AgSouth's internal policies and procedures on incomplete applications."

But such internal policies/procedures do not alone supply a legal duty so as to give rise to a negligence cause of action. See *Wage v. Amisub*, 235 Ga App. 156, 159-160 (2) (508 SE2d 783) (1998) (reiterating that "violations of private guidelines do not establish negligence per se") (citations and punctuation omitted); *Southern Ry Co. v. Allen*, 88 Ga. App. 435, 449 450 (12) (77 SE2d 277) (1953) (ascertaining that the standard of duty is fixed by law and thus cannot be enlarged or decreased by private rules of a corporation; thus determining that the violation of a private company's rule

14

alone does not give rise to a negligence cause of action); *Luckie v. Piggly-Wiggly Southern*, 173 Ga. App. 177, 178 (1) (325 SE2d 844) (1984) ("Privately established "rules are admissible as illustrative of negligence, but the violation of such a rule is not negligence in and of itself.") (citations and punctuation omitted) (physical precedent only). See also *Smith v. Russellville Production Credit Assn.*, 777 F2d 1544, 1548 (I) (11th Cir. 1985) (holding that "there is no implied private right of action under the Farm Credit Act"); see generally *Wagner v. Pennwest Farm Credit*, 109 F3d 909, 911-912 (II) (3d Cir. 1997) (collecting cases from federal circuits uniformly holding that there is no private right of action under the Agricultural Credit Act or its predecessor, the Farm Credit Act of 1971). Accordingly, to the extent that the Wests relied upon AgSouth's internal policies and procedures for demonstrating a legal duty, such sole reliance was unavailing. See *Wage*, 235 Ga. App. at 160 (2) (explaining that the plaintiffs failed to show negligence per se by contending that employees of the defendant medical center violated specific medical center policies and the accreditation organization's standards, because "[s]uch protocols and procedures do not have the force and effect of a statute or an administrative regulation"); see generally *Smith*, 777 F2d at 1548 (I); *Ebenhoh v. Production Credit Assn. of Southeast Minnesota*, 426 NW2d 490, 493 (1) (Minn. Ct. App. 1988)

15

("refus[ing] to permit a private cause of action based on the internal lending policies of [a production credit association] that could not be based on the [Farm Credit] Act itself or regulations promulgated pursuant thereto," and thus affirming grant of summary judgment to the lender on the negligence claim).

We note that in ruling that the Wests' negligence claim survived AgSouth's summary judgment challenge, the trial court reasoned that the claim rested upon "not merely internal policies regarding customers in general, but obligations imposed by a member based relationship." To the extent, however, that the Wests seek relief based upon a duty arising from such underlying relationship (which the Wests characterize as a fiduciary one), they have not demonstrated that any claim – even if viable[9] – is distinguishable from their breach of fiduciary duty claim.[10]

---

[9] We intimate no opinion as to the viability of the Wests' fiduciary claim. See Division 1, supra.

[10] Seeking affirmance of their favorable ruling nonetheless, the Wests broadly assert in their appellate brief that "AgSouth [has] common law duties under the laws of this [S]tate. AgSouth, as a lending institution, is required to exercise its common law duties with ordinary care." These vague assertions, however, fall short of overcoming AgSouth's summary judgment attack that the Wests had failed to support their negligence claim with a cognizable legal duty. See *JPMorgan Chase Bank, N.A. v. Durie*, 350 Ga. App. 769, 772 (3) (830 SE2d 387) (2019) ("A legal duty sufficient to support liability in negligence is either a duty imposed by a valid statutory enactment of the legislature or a duty imposed by a recognized common law principle declared in the reported decisions of our appellate courts.") (citation and punctuation

16

Because the trial court's denial of AgSouth's summary judgment as to the Wests' claim of negligence was thus error, we reverse that portion of the judgment.

3. AgSouth contends that it was entitled to summary judgment on the Wests' claim of breach of oral contract.[11]

In their complaint, the Wests alleged that they "entered into an oral contract based upon the representations made by AgSouth that the loan had been granted. AgSouth breached this contract when AgSouth denied [their] application." Seeking summary judgment on this claim, AgSouth argued that the purported oral contract was unenforceably vague for reason that the parties never reached any agreement as to essential terms such as applicable interest rate(s) and maturity date(s).[12] See

---

omitted); see generally *Pfeiffer v. Ga. Dept. of Transp.*, 275 Ga. 827, 828 (2) (573 SE2d 389) (2002) ("In responding to a motion for summary judgment, plaintiffs have a statutory duty to produce whatever viable theory of recovery they might have or run the risk of an adjudication on the merits of their case.") (footnote and punctuation omitted).

[11] "The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *Kuritzky v. Emory Univ.*, 294 Ga. App. 370, 371 (1) (669 SE2d 179) (2008).

[12] We note that AgSouth does not claim entitlement to summary judgment based on the Statute of Frauds. See OCGA § 13-5-30 (7) (requiring a signed writing for "[a]ny commitment to lend money"); *Stedry v. Summit Nat. Bank*, 227 Ga. App. 511, 514-515 (1) (489 SE2d 862) (1997); *Bridges v. Reliance Trust Co.*, 205 Ga. App.

17

*Bridges v. Reliance Trust Co.*, 205 Ga. App. 400, 403 (422 SE2d 277) (1992) ("A promise to make a loan with no specification of the interest rate or maturity date is not enforceable[.]") (citation and punctuation omitted); see generally *Reuben v. First Nat. Bank of Atlanta*, 146 Ga. App. 864, 866 (247 SE2d 504) (1978) ("A promise to make 'construction loans' without further particularity does not set forth an enforceable contract.").

"The party asserting the existence of a contract has the burden of proving its existence and its terms." *Jackson v. Easters*, 190 Ga. App. 713, 714 (1) (379 SE2d 610) (1989). "The consent of the parties being essential to a contract, until each has assented to all the terms, there is no binding contract; until assented to, each party may withdraw his bid or proposition." OCGA § 13-3-2. See *Auto-Owners Ins. Co. v. Crawford*, 240 Ga. App. 748, 750 (1) (525 SE2d 118) (1999) ("If there is any essential term upon which agreement is lacking, no meeting of the minds of the parties exists, and a valid and binding contract has not been formed."). See generally *Hartrampf v. Citizens & Southern Realty Investors*, 157 Ga. App. 879, 881 (1) (278 SE2d 750) (1981) ("The purported second loan 'commitment' is no more than [the lender's] agreement to agree in the future. Unless an agreement is reached as to all

400, 401 (2) (422 SE2d 277) (1992).

18

terms and conditions and nothing is left to future negotiations, a contract to enter into a contract in the future is of no effect.").

> If there was in fact any essential part of the contract upon which the minds of the parties had not met, or upon which there was not an agreement, even though the negotiations evidenced a complete willingness, or even an announced determination, to agree in the future upon such issues as might subsequently arise, it must follow that a valid and binding contract was not made as of the earlier date. Unless all the terms and conditions are agreed on, and nothing is left to further negotiations, a contract to enter into a contract in the future is of no effect. An agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto.

(Citations and punctuation omitted.) *Jackson*, 190 Ga. App. at 714-715 (1).

In concluding that the Wests' breach of oral contract claim survived AgSouth's summary judgment challenge, the trial court espoused in its order:

> The final loan document package is typically provided by the lender days or hours before a closing, and the final figures are subject to change at the whim of the lender until the printer prints out the closing package. This proposed loan involved months of communications as to the terms. The borrowers *allege* that an agreement was reached as to all essential terms. (Emphasis supplied.)

It appears that the trial court did not employ the analysis contemplated by OCGA § 9-11-56 in disposing of AgSouth's specific challenge – that the Wests' breach of oral contract claim lacked evidentiary support of a meeting of the minds as to the interest rate(s) and/or as to the maturity date(s). As instructed by *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991),

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A defendant may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. If there is no evidence sufficient to create a genuine issue as to any essential element of plaintiff's claim, that claim tumbles like a house of cards. All of the other disputes of fact are rendered immaterial. A defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case; instead, the burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue.

20

(Citation and emphasis omitted.) Id. at 491. Because it does not appear that the trial court applied the foregoing analysis,[13] we vacate the ruling on the breach of oral contract claim; on remand, the trial court may rule on AgSouth's specific challenge in a manner not inconsistent with this opinion.[14] See generally *Community Renewal &c. v. Nix*, 279 Ga. 840, 842 (2) (621 SE2d 722) (2005) (declining to apply a right-for-any-reason analysis, where denial of summary judgment was based on an

---

[13] See *Bagwell-Hughes, Inc. v. McConnell*, 224 Ga. 659, 661-662 (164 SE2d 229) (1968) ("The first requirement of the law relative to contracts is that there must be a meeting of the minds of the parties, and mutuality, and in order for the contract to be valid the agreement must ordinarily be expressed plainly and explicitly enough to show *what* the parties agreed upon.") (citation and punctuation omitted; emphasis supplied); *Bridges*, 205 Ga. App. at 402 (2) ("reject[ing] the borrower's argument that his testimony concerning his assumptions about the terms of the proposed loan create[d] an issue of fact for the jury," where "the proposed loan was to be a new and different loan and not merely a renewal of the existing loans").

[14] AgSouth additionally contends that principles enunciated in *Bridges*, 205 Ga. App. at 400, entitled it to summary judgment on the Wests' claims of fraud and promissory estoppel. See id. at 403 ("A promise to make a loan with no specification of the interest rate or maturity date is not enforceable and will not support an action for fraud. Neither does the doctrine of promissory estoppel apply . . . where those [complained-of] promises concern unenforceably vague future acts."). Indeed, AgSouth's summary judgment motion argued that the promissory estoppel and fraud claims were not viable on grounds that they were each predicated upon a promise that was unenforceable at the time it was made. Pursuant to our holding in this Division, the denial of AgSouth's motion as to the Wests' claims of promissory estoppel and fraud is vacated; and on remand, the trial court shall render rulings thereon not inconsistent with this opinion.

21

erroneous legal theory and the trial court's ruling left other issues/defenses unresolved); *Dodd*, 275 Ga. at 838-839 (espousing that where there are "a variety of grounds advanced, with disputes pertinent to those grounds," judicial economy may be maximized by returning the case to the trial court upon the appellate court's discovery that the trial court relied on an erroneous legal theory or reasoning); *United Healthcare &c. v. Ga. Dept. of Community Health*, 293 Ga. App. 84, 93 (2) (d) (666 SE2d 472) (2008).

4. AgSouth contends that they were entitled to summary judgment as to each of the substantive claims, maintaining that the Wests' assertion of lost profits was too speculative. Given our holdings in Divisions 1 and 3, supra, it is not ascertainable at this juncture which, if any, of the Wests' substantive claims survive AgSouth's summary judgment challenges. Moreover, the Wests assert that "[they] seek damages beyond lost profits." Thus, we do not now reach the merits of this contention. The trial court's ruling as to the lost-profits attack is vacated, permitting the trial court to render a ruling thereon upon remand.

*Judgment reversed in part, vacated in part and case remanded with direction. Mercier and Brown, JJ., concur.*

22